# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-AN-00946-SCT

*CITY OF JACKSON, MISSISSIPPI*

*v.*

*BYRAM INCORPORATORS*

*and*

*WHIT ADAMS, YOLANDE ALLEN, CHARLES BROOKS, CHARLOTTE BRYANT, MAC EDWARDS, TONI JONES, CAROLYN MANNING, STANLEY NOBLE, CARALEIGH PARAMORE, ANNETTE PARRETT, DARRELL SMITH, MIKE WALLEY, HELEN WHITE, HOWARD WHITLOCK AND SHIRLEY WILLIAMS*

*v.*

*CITY OF JACKSON, MISSISSIPPI, GREATER JACKSON INDUSTRIAL ASSOCIATION AND BYRAM INCORPORATORS*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/26/2007 |
| TRIAL JUDGE: | HON. WILLIAM H. SINGLETARY |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | JAMES L. CARROLL |
| | T. JACKSON LYONS |
| | J. CHADWICK MASK |
| | JACOB T. E. STUTZMAN |
| ATTORNEYS FOR APPELLEES: | JERRY L. MILLS |
| | JAMES L. CARROLL |
| | J. CHADWICK MASK |
| | JACOB T. E. STUTZMAN |
| | E. STEPHEN WILLIAMS |
| | STEPHEN E. GARDNER |
| NATURE OF THE CASE: | CIVIL - MUNICIPAL BOUNDARIES & ANNEXATION |

DISPOSITION:               AFFIRMED - 04/02/2009
MOTION FOR REHEARING FILED:   04/30/2009;  DENIED AND MODIFIED BY
                              REVISIONS IN FOOTNOTE 6 - 06/11/2009.
MANDATE ISSUED:

**EN BANC.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1.     This appeal involves the competing interests of the City of Jackson ("Jackson") and petitioners from the community of Byram over the same parcel of land.  The petitioners, known as the Byram Incorporators ("BI"), sought to incorporate an area of approximately forty-four square miles extending south of the existing corporate limits of Jackson.  Jackson sought annexation of a certain parcel of land ("Parcel 1"), which is comprised of 22.59 square miles and located entirely within the proposed incorporation area ("PIA").

¶2.     The chancellor consolidated the incorporation and annexation matters for trial.  After a lengthy trial, the chancellor found the incorporation of approximately twenty square miles to be reasonable.  The chancellor also found that Jackson had a "limited" need for expansion and found reasonable the annexation of an approximately four-square-mile area.  The trial court further found that certain areas sought to be incorporated by BI and annexed by Jackson should remain unincorporated in Hinds County.

¶3.     Jackson appeals to this Court from both the annexation decree and the incorporation decree, claiming that it is entitled to all of Parcel 1.  Various citizens ("Objectors"), who reside in the four-square-mile area that the trial court awarded to Jackson, appeal the trial court's grant of annexation and denial of incorporation.  BI does not appeal the final decree entered by the trial court but opposes Jackson's appeal.  Likewise, the Greater Jackson

2

Industrial Center Association ("Industrial Center") does not appeal the final decree, but contends the trial court was correct in allowing it to remain unincorporated in Hinds County.

## FACTS AND PROCEDURAL HISTORY

*First Petition for Incorporation*

¶4. BI filed its first petition for incorporation on March 18, 2002. Subsequently, BI voluntarily dismissed its petition because it lacked the statutorily required signatures of two-thirds of qualified electors.[1] The petition was dismissed without prejudice.

*Second Petition for Incorporation*

¶5. BI filed a second petition for incorporation on May 2, 2003, naming the City of Jackson, the Town of Terry, the City of Richland, and the Town of Florence as defendants. This petition consisted of fifty-five groups of signature pages, each group of pages being attached to a document labeled "Petition for Incorporation." This filing included those petitions and signature pages filed in 2002 ("2002 Petitions")[2] and copies of the petitions and signature pages circulated after the dismissal of the 2002 Petitions ("2003 Petitions").[3] The record reveals that the 2002 and 2003 Petitions were identical, except that as filed, the 2003 Petitions failed to contain page three. The 2002 Petitions did contain the missing page. Page

---

[1]Under Section 21-1-13 of the Mississippi Code, a petition for incorporation must be signed by "at least two-thirds of the qualified electors residing in the territory proposed to be incorporated." Miss. Code Ann. § 21-1-13(3) (Rev. 2007).

[2]The petitioners filed thirty-eight copies of the 2002 Petition with signature pages attached to each copy.

[3]The petitioners filed seventeen copies of the 2003 Petition with signature pages attached to each copy.

3

three contained the following information: the number of inhabitants in the PIA, the assessed value of real property in the PIA, and a portion of BI's aims in seeking incorporation.

*First Amended Petition for Incorporation*

¶6.    BI filed an amended petition for incorporation on July 17, 2003. In the amended petition, BI added two defendants, the Town of Raymond and the City of Clinton. Additionally, the amended petition included page three, but it contained a typographical error in the metes-and-bounds description of the PIA.

*Second Amended Petition for Incorporation*

¶7.    BI filed a second amended petition for incorporation on July 23, 2003.[4] In the second amended petition, the petitioners corrected the metes-and-bounds description of the PIA.

*Jackson's Annexation Ordinance*

¶8.    On March 23, 2004, the Jackson City Council adopted an Ordinance Enlarging and Extending the Corporate Boundaries of the City of Jackson. Jackson filed its petition for annexation on March 29, 2004. The ordinance and petition for annexation described three parcels of land, one of which, Parcel 1, was entirely within the PIA and is the subject of this appeal. Thereafter, the chancellor consolidated the incorporation and annexation proceedings.[5]

---

[4]The petitioners filed the amended and second amended petitions prior to any defendant filing an answer. Jackson was the first defendant to file an answer on August 29, 2003.

[5] By order dated June 27, 2005, the chancellor severed Parcel 2 and Parcel 3 from the proposed annexation/incorporation proceedings. Parcel 2 is located southwest of Jackson's existing corporate limits, and Parcel 3 is located northwest of the existing corporate limits. Thereafter, the chancellor approved the annexation of a revised area of the two parcels by

4

¶9. Jackson challenged the court's jurisdiction to hear the incorporation and moved to bifurcate the jurisdictional issues regarding incorporation. The trial court granted the motion to bifurcate, and a trial on the jurisdictional requirements commenced November 1, 2004. After five weeks of trial on jurisdictional issues, the trial court found that BI had established jurisdiction. Jackson appeals the chancellor's determination of jurisdiction.

¶10. By opinion and order entered December 21, 2006, the trial court determined that the incorporation of approximately twenty square miles was reasonable and required by public convenience and necessity. The trial court also determined that the annexation of approximately four square miles was reasonable. The trial court's ruling allowed some areas, including the Industrial Center, to remain in unincorporated Hinds County.

## DISCUSSION

I.     **Whether the Trial Court Had Jurisdiction To Consider the Petition For Incorporation.**

¶11. This Court reviews the chancellor's findings for manifest error as to whether a petition for incorporation is legally sufficient. *City of Pascagoula v. Scheffler*, 487 So. 2d 196, 199 (Miss. 1986). In explaining the standard of review, this Court has stated that it "cannot overturn the decree of a chancellor unless it finds with reasonable certainty that the decree is manifestly wrong on a question of law or interpretation of facts pertaining to legal questions." *Id.* at 200. As to questions of law, this Court applies a de novo review. *In re Extension & Enlarging of the Boundaries of Laurel*, 863 So. 2d 968, 971 (Miss. 2004).

---

final judgment entered July 26, 2005. The annexation consisted of approximately 3.95 square miles. The annexation of Parcels 2 and 3 is not the subject of this appeal.

¶12. Under Section 21-1-13, "[w]henever the inhabitants of any unincorporated territory shall desire to incorporate . . . they shall prepare a petition and file same in the chancery court of the county in which such territory is located." Miss. Code Ann. § 21-1-13 (Rev. 2007). The petition "shall" contain the following:

> (1) it shall describe accurately the metes and bounds of the territory proposed to be incorporated and there shall be attached to such petition a map or plat of the boundaries of the proposed municipality;
> (2) it shall set forth the corporate name which is desired;
> (3) it shall be signed by at least two-thirds of the qualified electors residing in the territory proposed to be incorporated;
> (4) it shall set forth the inhabitants of such territory;
> (5) it shall set forth the assessed valuation of the real property in such territory according to the latest available assessments thereof;
> (6) it shall state the aims of the petitioners in seeking said incorporation, and shall set forth the municipal and public services which said municipal corporation proposes to render and the reasons why the public convenience and necessity would be served by the creation of such municipal corporation;
> (7) it shall contain a statement of the names of the persons the petitioners desire appointed as officers of such municipality; and
> (8) it shall be sworn to by one or more of the petitioners.

Miss. Code Ann. § 21-1-13(1)-(8) (Rev. 2007). Furthermore, "the petitioners for incorporation have the burden of proving the sufficiency of [the] petition." *Scheffler*, 487 So. 2d at 198.

¶13. Jackson essentially presents three arguments in refuting the trial court's jurisdiction to hear the incorporation. First, Jackson argues that a petition for incorporation can never be amended after it has been filed. Second, Jackson argues that a petition with a technical error (i.e., a missing page) is fatal under Section 21-1-13 of the Mississippi Code. Last, Jackson argues that a petitioner may not utilize Rule 21 of the Mississippi Rules of Civil

6

Procedure to add a party defendant to a petition for incorporation. This Court addresses each argument in turn.

¶14. Jackson argues that the requirements of Section 21-1-13 are jurisdictional and must be met at the time the petition is filed. Jackson further argues that a petition for incorporation cannot be amended once it has been filed. Jackson supports its argument with the statutory language of Section 21-1-13 that a petitioner "shall prepare a petition and file same" and the petition "shall" contain the designated information. *See* Miss. Code Ann. § 21-1-13 (Rev. 2007). Jackson relies on a pre-rule case, ***Bridges v. City of Biloxi***, 168 So. 2d 40 (Miss. 1964), to support its contention that a petition must meet all the elements of Section 21-1-13 when filed.

¶15. In ***Bridges***, petitioners sought incorporation of an area west of the City of Biloxi and filed a petition for incorporation. ***Id.*** at 40. The petitioners then filed an amended petition with additional signatures. ***Id.*** On appeal, this Court stated "'[t]he petition must recite the existence of the conditions specified by statute to authorize incorporation, and those required by statute to be included in the petition for incorporation.'" ***Id.*** at 41 (quoting McQuillan, Municipal Corporations, § 3.26 (3d ed. 1949)). This Court held "that once the petition is filed, amendments thereafter cannot be made to include the names of additional petitioners." ***Id.*** The Court refused to count the signatures of the amended petition and evaluated the original petition to determine if it contained the necessary signatures. ***Id.***

¶16. Conversely, BI argues that a petition for incorporation can be amended, according to ***In re Inclusion into Ridgeland v. City of Jackson*** ("***Ridgeland***"), 494 So. 2d 348, 354 (Miss.

1986). ***Ridgeland*** involved petitioners who sought inclusion into the City of Ridgeland. ***Ridgeland***, 494 So. 2d at 349. The City of Jackson resisted the inclusion and "sought dismissal on numerous jurisdictional and procedural grounds -- short of an adjudication on the merits." ***Id.*** The chancellor dismissed the complaint without prejudice, finding that two-thirds of the qualified electors had failed to sign the petition. ***Id.*** On appeal, the Mississippi Supreme Court affirmed the trial court, and in dictum, stated:

> [W]e find that there were several deficiencies found in the complaint which border upon deserving of the label "hypertechnical". [sic] Our disposition of the matter today does not require that we address and decide these points . . . [however] *all might benefit if we* make *clear that all procedural aspects* of post-January 1, 1986, annexation prodeeding [sic] are subject to the *Mississippi Rules of Civil Procedure* except in the case of clear conflict between those rules and some statutory rule . . . . At the very worst, the many technical deficiencies found in the complaint are amendable in accordance with Rule 15(a), Miss. R. Civ. P. . . . we should be slow to allow insubstantial niceties to interfere with the pursuit of justice.

***Id.*** at 354 (emphasis added).

¶17. This Court notes that ***Ridgeland*** is a post-rule case in which we aptly directed future litigants to consult the Rules of Civil Procedure in addition to any applicable statutes. Furthermore, Mississippi Rule of Civil Procedure 81 provides that the Rules of Civil Procedure "apply to *all* civil proceedings but are subject to limited applicability in the following actions which are generally governed by statutory procedures . . . . (11) creation of and change in boundaries of municipalities[.]" Miss. R. Civ. P. 81(a)(11) (emphasis added). Rule 81 further provides that "[s]tatutory procedures specifically provided for each of the above proceedings shall remain in effect and shall control to the extent they may be in conflict with these rules; *otherwise these rules apply*." ***Id.*** (emphasis added).

8

¶18. While **Ridgeland** does provide that all procedural aspects of "annexation [proceedings] are subject to the Mississippi Rules of Civil Procedure[,]" **Ridgeland**, 494 So. 2d at 354, we are careful to note that there is "'a fundamental difference of some magnitude' between incorporation of an unincorporated area on the one hand and the extension of corporate boundaries on the other." **Lowe v. City of Jackson**, 336 So. 2d 490, 492 (Miss. 1976). Namely, "the Mississippi Legislature enacted *§ 21-1-27* granting unto *municipalities* the power of annexation, [and] the lawmakers specifically legislated so as to permit such annexation of land *without any requirement* that the inhabitants of the subject area give prior consent or in any way express their approval." **Id.** at 491 (emphasis added). The authority to initiate such proceedings rests with "the governing authorities of such municipality." Miss. Code Ann. § 21-1-27 (Rev. 2007).

¶19. As for incorporation, the Mississippi Legislature has provided that the "*inhabitants of any unincorporated territory . . . shall prepare a petition and file same in the chancery court.*" Miss. Code Ann. § 21-1-13 (Rev. 2007) (emphasis added). Such an action for incorporation must be initiated by the signatures of individual citizens living in the affected area. *See **id.*** "Moreover, the privilege of incorporating a municipality can be granted only by the Legislature, and, of course, the Legislature may put such restrictions on that privilege as it thinks proper." **City of Jackson v. Boling**, 241 So. 2d 359, 362 (Miss. 1970).

¶20. Because an incorporation is initiated by individual citizens rather than by a governing body, we do not find that all defects in a petition for incorporation are amendable pursuant to Rule 15. In fact, this Court has held otherwise. We have previously held that the two-thirds-signature element is a mandatory and jurisdictional requirement, and a petition for

9

incorporation cannot be amended to include additional signatures.[6] *Ridgeland*, 494 So. 2d at 354; *Bridges v. City of Biloxi*, 250 Miss. 717, 168 So. 2d 40, 40 (1964). Likewise, in looking at the plain language of Section 21-1-13, the Legislature has set forth a number of requirements that must be included in the petition, which is signed by the individual inhabitants of the area.

¶21. However, we agree that BI's failure to include page three *when filed* was a clerical error, not a failure to comply with the specific requirements of Section 21-1-13. The record shows that each petition included page three when it was circulated for signatures.[7] The record also shows that a copy shop inadvertently failed to copy and include page three when the petitions were being copied and assembled for filing. Therefore, the qualified electors, who signed the 2002 and 2003 Petitions, were notified of the information required by Section

---

[6]Jackson further argues the petitioners, who signed the petition in 2002, did not consent to a petition being filed in 2003. However, the petitioners were not required to consent to their petition being refiled in 2003 because they had the right to withdraw their name from the petition. This Court has stated that "one can withdraw from a petition at any time prior to the determination of the hearing." *Myrick v. Incorporation of a Designated Area into Municipal Corp. to be Named Stringer*, 336 So. 2d 209, 211 (Miss. 1976). Because each petitioner had the right to withdraw from the petition and Jackson never put on evidence that any petitioner was denied that right, it must be presumed that each petitioner implicitly consented to the 2003 filing by allowing his or her name to remain on the petition. Also, Jackson has presented no case law to support its contention that the 2003 filing required express consent from the 2002 petitioners.

[7]Amy Flournoy, an interim alderman, testified that she was responsible for assembling the 2003 Petitions and distributing them to volunteers to obtain signatures. Flournoy testified that she personally examined each petition on every clipboard and each petition included page three when it was circulated for signatures.

21-1-13.[8] *See also **Boling***, 241 So. 2d at 362 (holding that the petition for incorporation which is filed in the chancery court must be identical to the petition which is circulated and signed by two-thirds of the qualified electors).

¶22.     We find that BI's failure to include page three in some of the filed petitions was a clerical or "technical" error amendable under Rule 15 of the Mississippi Rules of Civil Procedure.[9] *See **Ridgeland***, 494 So. 2d at 354.  We do not find any conflict between Section 21-1-13 and Rule 15 which would prevent the application of Rule 15 to rectify such a clerical error.

¶23.     Jackson further argues that BI's petition was jurisdictionally fatal pursuant to Section 21-1-15 of the Mississippi Code because it omitted the Town of Raymond and the City of Clinton as defendants.  Section 21-1-15 provides:

> [N]otice shall be given to all persons interested in, affected by, or having objections to the proposed incorporation . . . . However, if any of the territory proposed to be incorporated is located within three miles of the boundaries of an existing municipality, then *such existing municipality shall be made a party defendant to such petition*.

---

[8]This Court does not find merit in Jackson's argument that the 2003 Petitions, as circulated, were materially different from the 2002 Petitions or that the 2003 Petitions were circulated in short form.  The chancellor found that the 2003 Petitions were complete at the time they were circulated for signatures.  The chancellor appropriately heard testimony and received evidence regarding the form of the petitions, and his findings are supported by substantial and unrebutted evidence.

[9]Relevant to these proceedings, Rule 15 provides that "[a] party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served . . . . Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Miss. R. Civ. P. 15(a).

11

Miss. Code Ann. § 21-1-15 (Rev. 2007) (emphasis added).

¶24. Conversely, BI argues that it properly added the Town of Raymond and the City of Clinton as defendants pursuant to Rule 21 of the Mississippi Rules of Civil Procedure. Rule 21 provides that "[p]arties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just." Miss. R. Civ. P. 21.

¶25. Section 21-1-15 is silent as to whether parties may be added after a petition for incorporation has been filed. This Court does not find any conflict between Section 21-1-15 and Rule 21 that would prohibit the use of Rule 21 for the purpose of adding defendant municipalities to a petition for incorporation. The important inquiry is whether the Town of Raymond and the City of Clinton received proper notice. After BI filed the amended and second amended petitions, Raymond and Clinton timely received service of process.[10] Additionally, neither municipality objected to the proposed incorporation. We find BI timely notified and added Raymond and Clinton as party defendants in compliance with Section 21-1-15 of the Mississippi Code. We agree that the trial court had jurisdiction to consider the merits of incorporation, as the petitioners complied with Section 21-1-13 and Section 21-1-15.

---

[10]The summons for the second amended petition contained the following language: "The Petition for Incorporation, Amended Petition for Incorporation, and the Second Amended Petition for Incorporation of the Incorporators of Byram, Mississippi and the Notice of Hearing on said Petitions, which are *attached* to this Summons, are being served on you because you are required by law to be made a party defendant to this matter." (Emphasis added). Proof of service for the Town of Raymond and the City of Clinton was filed July 31, 2003.

**II. Whether the Incorporation of Approximately Twenty Square Miles into the City of Byram is Reasonable and Required by Public Convenience and Necessity.**

**A. Whether the Incorporation of the City of Byram is Reasonable.**

¶26. Once a petition for incorporation has been filed with the chancery court, the chancellor must determine whether incorporation is reasonable and required by public convenience and necessity. Miss. Code Ann. § 21-1-17 (Rev. 2007). Furthermore, the "chancellor shall have the power . . . in granting any such incorporation to grant same in whole or in part by modifying or decreasing the territory to be included within such municipal corporation." *Id.* When reviewing the chancellor's findings of incorporation, this Court applies the standard of manifest error. *City of Pascagoula v. Scheffler*, 487 So. 2d 196, 200 (Miss. 1986).

¶27. In his order and opinion, the chancellor set forth and evaluated the fourteen, non-exhaustive factors indicative of reasonableness:

(1) whether a proposed area has definite characteristics of a village;
(2) whether the residents of the proposed area for incorporation have taken initial steps toward incorporation;
(3) whether a nearby city has initiated preliminary proceedings toward annexation;
(4) whether there [have] been any financial commitments toward incorporation or annexation proceedings;
(5) whether a neighboring city has the prerogative to contest incorporation;
(6) whether incorporation affects an existing city within three miles;
(7) whether population of [the] area shows an increase and continuity of settlement;
(8) whether a community has a separate identity;
(9) whether natural geographical boundaries separate an area from other municipalities;
(10) whether transportation is affected;
(11) whether incorporation will affect the interest of landowners in the affected area;

13

(12) whether cost of operating the municipality is prohibitive;

(13) whether an estimated tax base of proposed area will support incorporation; and

(14) whether the overall welfare of residents of [the] affected area is improved by incorporation.

*Id.* at 201-02.  "No one factor per se determines reasonableness, but a consideration of all pertinent factors gives guidance to reach an ultimate conclusion."  *Id.* at 201.

**Factor 1: Whether the PIA has definite characteristics of a village.**

¶28.    Jackson argues the area granted for incorporation does not contain characteristics of a village, since it lacks a town center and various public services and amenities.  BI asserts the PIA has characteristics of a village and points to the fact that the United States Census Bureau recognized Byram as a census-designated place.  The Objectors contend that they feel a sense of community with Byram, not Jackson, and should be included in the area to be incorporated.

¶29.    The chancellor heard ample evidence of Byram's established history as an identifiable area with a growing population.  In fact, Byram initially was incorporated in 1870 and has since retained its separate identity as a community.[11]  Furthermore, the record shows that Byram is a self-contained community with at least 450 businesses.  Joseph Lustek, an expert for BI in the field of urban and regional planning, testified that as of 2000, 60.24 percent of land in the PIA was committed to urban and recreational use.  The chancellor also heard testimony regarding those portions of the PIA that had little connection to the Byram community: the flood-plain area east of Interstate 55, the Greater Jackson Industrial Center,

---

[11]Kent Alday, interim alderman, testified that Byram lost its charter during the Great Depression because it failed to hold regular city meetings.

and the southern and northern rural areas of the PIA. We also find it noteworthy that the chancellor viewed the PIA prior to rendering an opinion. This Court finds substantial and credible evidence to support the chancellor's determination that the twenty-square-mile area has definite characteristics of a village.

**Factor 2: Whether the residents of the PIA have taken initial steps toward incorporation.**

¶30. BI presented evidence that it had hired professionals in the fields of engineering and urban and regional planning; obtained legal representation; prepared and circulated petitions for incorporation; and obtained signatures of two-thirds of the qualified electors in the PIA. Testimony also established that the residents of the PIA have made significant financial commitments toward incorporation, and some residents have been serving as interim officials.

¶31. The chancellor concluded that BI had taken initial steps toward incorporation. The chancellor's findings under this factor are supported by substantial evidence. BI has taken initial steps toward incorporation through its various efforts at forming a transitional government and obtaining support from the area's residents.

**Factor 3: Whether a nearby city has initiated preliminary proceedings toward annexation.**

¶32. Jackson argues that BI's incorporation attempt is a defensive measure in response to Jackson's efforts to annex a portion of the same area. Jackson notes it first attempted to annex the Byram area in 1990. BI counters that Jackson has attempted to annex the more

15

lucrative, tax-rich portions of the incorporation area while ignoring the schools and a great number of people.

¶33. The chancellor recognized that Jackson has been trying to annex the Byram area since the 1990s, but he concluded Jackson's efforts did not affect the reasonableness of incorporation. This Court agrees with the chancellor's assessment of this factor. We do not accept Jackson's argument that BI's petition for incorporation is a defensive measure to Jackson's annexation attempt from twelve years prior.

**Factor 4: Whether there have been any financial commitments toward incorporation or annexation proceedings.**

¶34. Jackson asserts that it has been investing in the Byram area since the 1980s, providing mutual fire-aid protection, waterworks services, and wastewater treatment. Jackson has provided a number of water lines and fire hydrants in the area since 1993. Jackson asserts that it has spent enormous sums of money on legal and expert fees.

¶35. BI asserts it also has spent substantial amounts of money, which was raised through voluntary donations. BI counters that the water and sewer services generate revenue for Jackson, and Jackson will continue to receive that revenue upon incorporation as long as it provides the services.

¶36. The chancellor concluded that BI and Jackson each had spent substantial sums of money in their respective efforts to incorporate and annex the Byram area. The record supports the chancellor's finding as to this factor.

**Factor 5: Whether a neighboring city has the prerogative to contest incorporation.**

16

¶37. Jackson contends that it has the prerogative to contest incorporation, since it is a statutory defendant pursuant to Section 21-1-15 of the Mississippi Code; it has initiated annexation proceedings; and it has committed financial resources toward annexation. Jackson further contends that the PIA/PAA is within its path of growth. BI agrees that Jackson has the prerogative to contest incorporation. However, BI notes that Jackson was awarded a portion of the area it sought to annex, and the chancellor reduced the PIA. BI asserts that the reduction in the PIA has allowed future annexation of land to the south of Jackson's city limits.

¶38. While Jackson has the prerogative to contest incorporation, we agree with the chancellor that Jackson's prerogative does not render the incorporation unreasonable. The chancellor duly revised the PIA in addition to approving the annexation of the four-square-mile area. Therefore, this Court finds substantial evidence supports the chancellor's ruling as to factor five.

### Factor 6: Whether incorporation affects an existing city within three miles.

¶39. Jackson contends the incorporation will block its path of growth to the south. Jackson further contends that its growth is restricted by Ridgeland to the north, Clinton to the west, and Flowood, Pearl, and Richland to the east. Jackson also argues the incorporation will prevent it from acquiring land it needs for increasing its tax base.

¶40. We agree with the chancellor that incorporation will affect Jackson. The incorporation of Byram will obviously affect Jackson's ability to expand and increase its revenue.

17

**Factor 7: Whether the population of the PIA shows an increase and continuity of settlement.**

¶41. The chancellor found that the revised PIA contains a large concentration of population with various businesses, including churches, schools, libraries, parks, a volunteer fire department, civic clubs, and a post office. The chancellor also relied on expert testimony that established the population in the PIA has been increasing as families and businesses move into the area. The chancellor concluded that the area outside the revised PIA has not experienced the same continuity of settlement and growth.

¶42. The chancellor heard testimony that the population had exploded in the PIA over the past six years, with the voter rolls tripling since 1989. Steve Reno, a major-account service manager for Entergy, testified that Entergy built a substation about ten years ago in the Byram area to accommodate the growth. Joseph Lustek compiled vital statistics for the PIA and found in 2000 the area contained 4,813 single-family homes, 310 manufactured homes, and four apartment complexes. However, the area east of Interstate 55 and the southern portion of the PIA contains little residential development. Much of the area east of Interstate 55 lies in a flood plain, with a very low population density. This Court finds that substantial evidence supports the chancellor's determination that the revised PIA shows an increase and continuity of settlement.

**Factor 8: Whether a community has a separate identity.**

¶43. Jackson argues that many transportation routes connect the PIA with Jackson, and many people in the PIA work in Jackson. While Byram has an interstate exit, Jackson contends the exit functions as a connector between local and state roads. Jackson further

18

asserts that it provides numerous municipal services to the PIA, such as waterworks, wastewater treatment, water lines, water supply, fire hydrants, and fire protection.

¶44. The chancellor found the revised PIA has a separate identity as evidenced by "road signs, road maps, official maps, telephone listings, the United States Postal Service, the United States Bureau of Census, schools, churches, fire departments, civic clubs, libraries, businesses, real estate segmentation, and other." The chancellor also found a sense of "Byram pride" when he toured the area. However, the chancellor found that the flood-plain area east of Interstate 55, the Industrial Center, and the southernmost area sought to be incorporated "do not share the separate and distinct identity of the general Byram area." The chancellor also concluded the northernmost area is "an extension of the City of Jackson that has yet to be annexed."

¶45. We find that Jackson's provision of utility services and limited fire protection to the PIA does not detract from the area's separate identity. Furthermore, the record shows that a majority of people and businesses are concentrated in the revised PIA. We find substantial evidence supports the chancellor's ruling that the revised PIA has a separate identity.

**Factor 9: Whether natural geographical boundaries separate the PIA from other municipalities.**

¶46. The chancellor found, and the parties do not dispute, that no natural geographical boundaries separate Jackson from the PIA.

**Factor 10: Whether transportation is affected.**

¶47. Jackson contends that incorporation will have a negative impact on traffic. Jackson argues that a newly-incorporated Byram will have to implement a public works department

19

with an insufficient budget of $1,200,000 while Jackson already has the resources and manpower for road maintenance. Jackson also argues the Jackson Police Department ("JPD") will be able to handle traffic problems in the Byram area, while BI plans to rely on the Hinds County Sheriff's Department, which is statutorily prohibited from using radar. BI counters that it could employ an interlocal agreement with the Sheriff's Department which would allow the use of radar.

¶48. The chancellor acknowledged that an incorporated Byram will have to take over road maintenance from Hinds County. The chancellor relied on testimony from Hinds County Sheriff Malcolm McMillin that the traffic in the PIA "has gotten out of control." The chancellor noted BI plans to supplement the sheriff's budget for increased services or replace the Sheriff's Department with its own municipal police department. The chancellor found BI could quickly implement its plans, and the incorporation would have a positive impact on transportation in the area.

¶49. The chancellor also heard testimony from Pat Guest, BI's expert in the field of municipal engineering. Guest helped BI create a general plan concerning a public works department. The department initially will consist of one superintendent, two-to-four laborers, a half-ton truck, a two-ton flatbed truck with dump body, and a rubber tire hoe. Guest also recommended the public works department consult with an engineer until the "workload justified a public works director and/or city engineer."

¶50. We find substantial evidence supports the chancellor's finding that incorporation of the revised PIA is reasonable under this factor. The records shows that BI has hired and

consulted with experts in formulating general plans to address traffic problems and street maintenance.

**Factor 11: Whether incorporation will affect the interest of landowners in the affected area.**

¶51. Jackson argues that it is impossible to determine how incorporation will affect landowners in the revised PIA, since BI has not offered a specific plan to provide municipal services to the area. Jackson asserts that BI has put forth a "conceptual $6 million budget" without specifying which services or capital improvements will be provided to the PIA.

¶52. BI asserts it will create and provide plans for municipal services once Byram is incorporated and has sworn officers with the power to create such plans. BI further argues that landowners will have a voice in a self-determined government and will experience enhanced municipal services. The Objectors contend incorporation would enhance the value of their property.

¶53. The chancellor found that an incorporated Byram will be able to provide its citizens with a localized government, enhanced municipal services, and increased property values. In reaching his conclusion, the chancellor heard testimony from various experts who helped BI formulate an implementation plan. The implementation plan contains a budget for basic municipal services based on expected revenues.

¶54. This Court finds the chancellor appropriately concluded that landowners in the revised PIA will benefit from increased land values and enhanced services. Landowners in the four-square-mile area should likewise experience increased land values and enhanced services upon annexation.

21

**Factor 12: Whether the cost of operating the municipality is prohibitive.**

¶55.    Jackson reiterates its contention that BI has failed to propose a specific plan for municipal services and infrastructure.  Jackson further argues that BI's six-million-dollar budget is insufficient to fund all of the proposed departments unless the municipal services will be extremely minimal.  Jackson also argues that it is more cost-efficient for it to provide services to the PIA/PAA through annexation.

¶56.    Conversely, BI argues the testimony of its experts proves that the tax base of the PIA is more than sufficient to support incorporation.  BI also asserts that the revised PIA produces a majority of the PIA's revenue, and with less land to service, the cost of incorporation is not prohibitive.

¶57.    The chancellor found BI has viable plans to increase police protection and fire protection in the PIA.  The chancellor acknowledged that BI has a "realistic" plan to supplement the Sheriff's Department or provide a municipal police department.  The chancellor also found reasonable BI's plan to enhance the existing volunteer fire department or create a full-time fire department. The chancellor relied on expert testimony that established the incorporated area will continue to utilize water services provided by Jackson with long-term plans to purchase the system.  The chancellor also found that BI plans to use Jackson's Trahon Waste Water Treatment Facility for the treatment of sewer.  The trial court noted BI plans to construct interceptor lines to connect with existing sewered areas.  The chancellor concluded the implementation of ordinances will control sewer services and future

22

developments, and will also improve storm water management. The chancellor also reiterated BI's plan to provide a public works department.

¶58. The chancellor also evaluated the various sources of funding available to the PIA. He relied on expert testimony that established that the tax base of the PIA (and the revised incorporated area) was more than sufficient to provide revenue for a municipality. The trial court also heard testimony about the various sources of available municipal financing, such as: "community development block grants, an economic development grant, public facilities grant, CAP loan, TIF, State Revolving Loan Fund, CMPDD, NRCS, EPA, and revenue funds." The chancellor found that "fees for ordinance enforcement could be generated through the general fund, tap fees, inspection fees, and impact fees." The chancellor concluded there was clear evidence that the cost of incorporating the revised PIA was not prohibitive.

¶59. The chancellor's findings for factor twelve are supported by substantial evidence. While annexation by Jackson may be more cost-efficient, the PAA leaves out a majority of residents who are in need of municipal services. The revised incorporation area has sufficient sources of funding and revenue and it serves a majority of the area's residents.

**Factor 13: Whether an estimated tax base of the PIA will support incorporation.**

¶60. Jackson argues that it cannot determine whether a sufficient tax base exists because BI has failed to provide a specific plan for services. BI asserts that its experts applied a range of tax levies comparable to other Mississippi municipalities and found the tax base sufficient to support incorporation.

23

¶61. The chancellor relied on expert testimony to conclude that the estimated tax base of the PIA supports incorporation. Gary L. Walker, Certified Public Accountant and CPA for the City of Richland, testified on behalf of BI. Walker testified that the assessed values in the PIA as of May 2002 were: $59,997,870 for realty; $5,137,235 for personal property; $20,675,084 for motor vehicles; and $4,772,537 for public utilities. The total assessed value in the PIA was $90,582,726. The chancellor aptly noted that the assessed values are lower in the revised PIA; however, expert testimony established that a revised PIA will only strengthen the financial posture of an incorporated Byram. This Court finds substantial evidence supports the chancellor's findings that the tax base of the revised PIA is more than adequate to support incorporation.

**Factor 14: Whether the overall welfare of residents of the affected area is improved by incorporation.**

¶62. The chancellor concluded that the overall welfare of the residents will be improved by incorporation. He found that a localized government will be sensitive to the area's needs, and property values will increase. The chancellor further found that residents in the revised PIA will experience an increase in law-enforcement, emergency-management, fire-protection, and public-works services. The chancellor noted that an increase in fire and police protection will cause insurance premiums to decrease. The chancellor also found water and sewer services will improve with incorporation. We find substantial evidence supports the chancellor's ruling that the overall welfare of the area's residents will improve.

**Summation on the issue of whether the incorporation of the City of Byram is reasonable:**

24

¶63. After considering each of the fourteen factors set out in *Scheffler*, the chancellor concluded that the incorporation of the revised PIA is reasonable. We again acknowledge that no one factor, standing alone, will determine whether the proposed incorporation of an area is reasonable, but instead, the trial court is duty-bound to consider all the pertinent factors. *Scheffler*, 487 So. 2d at 201. With all of this in mind, we find from the record before us that the chancellor's findings as to the reasonableness of the incorporation of the revised PIA are supported by substantial evidence and are not in manifest error.

**B. Whether the Incorporation of the City of Byram is Required by Public Convenience and Necessity.**

¶64. This Court has set forth the following factors to aid the chancellor's determination of public convenience and necessity:

1. the governmental services presently provided;
2. the quality of services and adequacy of all services provided;
3. the services expected from other sources;
4. the impairment of an immediate right vested in an adjoining city; and
5. the substantial or obvious need justifying incorporation.

*Sheffler*, 487 So. 2d at 200-01.

**Factor 1: The governmental services presently provided.**
**Factor 2: The quality of services and adequacy of all services provided.**

¶65. James Elliot, an expert for Jackson in the field of engineering and public works, testified that Jackson holds a certificate of public convenience and necessity for the provision of water to much of the PIA. He also testified that Jackson provides sewer services for one mile outside the city limits, and Jackson provides transportation and treatment of sewer for a portion of the PIA. Testimony established that Jackson is compensated for the provision

25

of water and sewer services to the PIA through user fees. Guest testified that several developers own sewer certificates in the PIA, and some of the sewage is treated by individual permits and some by the City of Jackson's Trahon Waste Water facility. Guest also testified that many homes in the PIA have individual septic tanks that treat and collect sewage. Guest testified that the Byram area is in need of a centralized sewer system.

¶66. Phifa Eiland testified that the schools located in the Byram area are in need of municipal sewer services.[12] She also stated there was a need for planning and zoning with respect to the placement of apartments in the Byram area. Amy Douglas also testified there is a need for stricter planning and zoning, as evidenced by the placement of an adult bookstore on Frontage Road. Kent Alday testified that there is a need for additional traffic lights, particularly in school areas.

¶67. As for police protection, several witnesses testified the area needs additional police protection because of an increase in criminal activity and traffic in the PIA. Other witnesses testified to a need for additional fire protection with a full-time staff, as the area is serviced by one volunteer fire department.

¶68. After due consideration of the services presently provided, the chancellor found that the Byram area is in need of services on a municipal level. The chancellor's findings as to these two factors are supported by substantial evidence.

**Factor 3: Services expected from other sources.**

---

[12]Three schools are located in the PIA: Gary Road Elementary School, Gary Road Intermediate School, and Byram Middle School. Approximately 3,000 students attend these schools.

¶69. The chancellor found BI planned to supplement the Hinds County Sheriff's Department for increased police protection. He also found that Jackson will continue to provide water and sewer treatment to the Byram area upon incorporation. The chancellor concluded that an incorporated Byram will provide all other services. After reviewing the record, we find the chancellor's ruling is supported by substantial and credible evidence. While no municipality is self-sufficient, the record shows that an incorporated Byram will be financially capable of providing its citizens with an array of municipal services.

**Factor 4: The impairment of an immediate right vested in an adjoining city.**

¶70. Jackson argues that the Mississippi legislature has granted it the right to annex the PAA through Section 21-1-27[13] of the Mississippi Code, and the incorporation of the revised PIA impairs that right. BI counters that Jackson's attempt to annex a portion of the PIA is not a vested right because Mississippi law requires the court to determine the reasonableness of annexation.

¶71. The chancellor determined that Byram's incorporation will not impair an immediate right of Jackson, as the incorporation will not prevent Jackson's future growth. We find the chancellor did not commit manifest error under this factor. While Byram's incorporation will substantially hinder Jackson's future growth, Jackson does not have an unfettered right to annexation.

---

[13]The Mississippi Legislature has granted municipalities the right to enlarge their corporate boundaries under Section 21-1-27 of the Mississippi Code if the governing authority for a municipality passes an ordinance and the ordinance contains certain information. *See* Miss. Code Ann. § 21-1-27 (Rev. 2007).

**Factor 5: The substantial or obvious need justifying incorporation.**

¶72. Jackson agrees that the Byram area has substantial and obvious needs but contends these needs are better addressed by annexation than by incorporation. Jackson asserts annexation will be more beneficial than incorporation because Jackson already has departments in place that provide numerous services.

¶73. Under this factor, the chancellor reiterated his previous finding that the PIA's rapid growth has established a substantial need for municipal-level services. The chancellor concluded that an incorporated Byram will address the needs of more people than annexation. We find the record supports the chancellor's ruling as to this factor.

> **Summation on the issue of whether the incorporation of the City of Byram is required by public convenience and necessity:**

¶74. After considering each of the five factors set out in *Scheffler*, the chancellor concluded that the incorporation of the revised PIA was required by public convenience and necessity. *Scheffler*, 487 So. 2d at 201. We find the chancellor properly weighed and considered the evidence and applied the law. We find no manifest error and affirm the chancellor's finding that the incorporation of the revised area is required by public convenience and necessity.

> **IV. Whether the Chancellor Committed Manifest Error in Allowing Jackson to Annex Only Four Square Miles Instead of the Entire PAA.**

¶75. This Court has stated that "we will not reverse the findings of a chancellor unless the chancellor applies an incorrect legal standard, is manifestly wrong, or the findings are not supported by substantial evidence." *Prestridge v. City of Petal*, 841 So. 2d 1048, 1051

(Miss. 2003). "Even where the credible evidence is conflicting, this Court will not reverse unless the chancellor's findings are manifestly wrong." *In re Enlargement & Extension of the Mun. Boundaries of Madison v. City of Madison*, 650 So. 2d 490, 495 (Miss. 1995). Furthermore, "[a]nnexation is a legislative affair. The judicial function is limited to the question of whether the annexation is reasonable." *In re Enlargement & Extension of the Mun. Boundaries of Biloxi v. City of Biloxi* ("*Biloxi*"), 744 So. 2d 270, 277 (Miss. 1999). This Court has also ruled "[t]he only power vested in the court is in the determination of the reasonableness or unreasonableness of an enlargement and whether it should be reduced." *In re Extension & Enlargement of the Boundaries of Laurel*, 863 So. 2d 968, 972 (Miss. 2004) (citing Miss. Code Ann. § 21-1-33).

¶76. In his opinion and order, the chancellor set forth and evaluated the twelve factors that this Court has enumerated for determining the reasonableness of annexation:

(1) the municipality's need for expansion;
(2) whether the area sought to be annexed is reasonably within a path of growth of the city;
(3) the potential health hazards from sewage and waste disposal in the annexed areas;
(4) the municipality's financial ability to make the improvements and furnish municipal services promised;
(5) the need for zoning and overall planning in the area;
(6) the need for municipal services in the area sought to be annexed;
(7) whether there are natural barriers between the city and the proposed annexation area;
(8) the past performance and time element involved in the city's provision of services to its present residents;
(9) the impact (economic or otherwise) of the annexation upon those who live in or own property in the area proposed for annexation;
(10) the impact of the annexation upon the voting strength of protected minority groups;

(11) whether the property owners and other inhabitants of the areas sought to be annexed have in the past, and for the forseeable future unless annexed will, because of their reasonable proximity to the corporate limits of the municipality, enjoy the (economic and social) benefits of proximity to the municipality without paying their fair share of the taxes; and
(12) any other factors that may suggest reasonableness vel non.

*In re Extension of the Boundaries of Winona v. City of Winona* ("*Winona*"), 879 So. 2d 966, 972 (Miss. 2004). The twelve indicia are "'not separate and distinct tests in and of themselves . . . [and] the chancellor must consider all [twelve] of these factors and determine whether under the totality of the circumstances the annexation is reasonable.'" *Id.* at 972-73 (quoting *Biloxi*, 744 So. 2d at 276).

**Factor 1: Jackson's need for expansion.**

¶77. This Court has enumerated the following factors the trial court may or may not consider in determining whether a municipality has a need for expansion:

(1) spillover development into the proposed annexation area; (2) the City's internal growth; (3) the City's population growth; (4) the City's need for development land; (5) the need for planning in the annexation area; (6) increased traffic counts; (7) the need to maintain and expand the City's tax base; (8) limitations due to geography and surrounding cities; (9) remaining vacant land within the municipality; (10) environmental influences; (11) the city's need to exercise control over the proposed annexation area; and (12) increased new building permit activity.

*Id.* at 974 (citing *In re Enlargement & Extension of the Boundaries of Macon v. City of Macon*, 854 So. 2d 1029, 1034 (Miss. 2003)).

¶78. Jackson argues the residential and commercial activity in the PAA is spillover development. Jackson also argues it has experienced internal growth, as evidenced by the number of permits issued for residential development, commercial buildings, and commercial

renovations from 1993 through 2004. While Jackson admits that its population is declining, it asserts that it has a high population density (1,724.27 residents per square mile in 2002) in relation to comparable southern cities. Jackson also asserts that it has only fifteen-to-twenty percent vacant, developable land within its city limits. Jackson further asserts the PAA has a need for additional planning as evidenced by its "unpaved roads, erosion, dead end streets with no turnaround, and non-curbed and guttered streets." Jackson asserts traffic counts have increased in the PAA since 1985, and Jackson points to expert testimony that the City of Jackson needs to expand its tax base in order to increase revenues. Last, Jackson reiterates that its future expansion is limited by surrounding municipalities and flood-prone areas.

¶79. BI counters that Jackson is a city in decline because Jackson's population has decreased over the past twenty years. BI asserts that Jackson's residential development has declined and housing vacancies have risen. BI further asserts the amount of land in industrial and residential use declined between 1990 and 2000.

¶80. The Objectors contend Jackson's population will continue to decrease in the forseeable future. They argue that the development in the PAA is "leap-frog" rather than spillover. Furthermore, the Objectors assert Jackson can expand to the northwest and southwest instead of expanding into the Byram area.

¶81. The chancellor relied on expert testimony that Jackson has a need to expand based on the city's building-permit activity. The chancellor also cited testimony that Jackson has limited areas in which to expand, since it is blocked by the Pearl River and surrounding

municipalities. The chancellor further found that Jackson's population is projected to start increasing in 2010; Jackson has a high population density compared to other southern cities; traffic counts have increased in the PAA; and the PAA has experienced spillover growth. The chancellor also noted Jackson has approximately thirty percent vacant land, but "vacant" includes land in use for agricultural and forestry purposes and land that is located in flood-prone areas. The chancellor concluded that Jackson, in actuality, has fifteen percent vacant, developable land.

¶82. This Court "refuses to set a limit on the vacant land available and has approved annexations when there has been as much as 59% usable vacant land available to an area." *In re Enlargement & Extension of the Mun. Boundaries of Clinton v. City of Clinton*, 955 So. 2d 307, 315 (Miss. 2007). Regardless of whether Jackson has thirty percent or fifteen percent vacant land, substantial evidence supports the chancellor's finding that Jackson has a *limited* need to expand. Even with its population in decline, Jackson still maintains a high population density of 1,724.27 residents per square mile that could be alleviated with annexation. *E.g.*, *id.* (finding 1,000 persons per square mile in the City of Clinton was "very dense," which supported the city's need to expand). The record also shows that Jackson has experienced steady commercial activity and increased traffic counts in the I-55 corridor. Furthermore, Jackson presented evidence that it has a need for increased revenue, and it is undisputed that much of the PAA is in need of planning. After reviewing the record, this Court finds the chancellor appropriately reduced the PAA to four square miles, which is in direct proportion to Jackson's need to expand.

**Factor 2: Whether the PAA is reasonably within Jackson's path of growth.**

¶83.  This Court has enumerated the following factors the trial court may or may not consider in determining whether the path of growth is reasonable:

> (1) spillover development in annexation area; (2) annexation area immediately adjacent to City; (3) limited area available for expansion; (4) interconnection by transportation corridors; (5) increased urban development in annexation area; (6) geography; and (7) subdivision development.

*Winona*, 879 So. 2d at 977.  The most important factors are whether the PAA is immediately adjacent to the city; the accessibility of the PAA by city streets; and spillover development.

*Id.* (citing *Enlargement & Extension of the Mun. Boundaries of Meridian v. City of Meridian*, 662 So. 2d 597, 612-13 (Miss. 1995)).  Furthermore, "a city need only show that the areas desired to be annexed are in 'a' path of growth . . . [not] 'the most urgent or even the city's primary path of growth.'"  *Id.*  (quoting *In re Extension of the Boundaries of Hattiesburg v. City of Hattiesburg* ("*Hattiesburg*"), 840 So. 2d 69, 86-87 (Miss. 2003)).

¶84.  Jackson asserts it has historically grown in an outward fashion from the Pearl River, and the Byram area is within its path of growth.  Jackson also argues that it presented evidence of spillover growth to the trial court, and the PAA is immediately adjacent to the city limits.  Furthermore, Jackson asserts Interstate 55, Terry Road, Old Byram Road, and Siwell Road connect Jackson to the PAA.  Jackson also argues it has limited areas in which to expand, and traffic counts have increased in the PAA.  Lastly, Jackson argues it has invested approximately $73,000,000 in the Byram area.

¶85.    BI contends Jackson's lack of residential growth and declining population indicate the capital city is not growing.  The Objectors likewise contend that the subdivision growth in the four-square-mile area is not in proportion to growth in Jackson's city limits.

¶86.    The chancellor cited expert testimony that Jackson historically has grown in an outward fashion and will continue to grow in the same pattern.  The chancellor relied on testimony that the PAA has suburban spillover growth as evidenced by the extension of utilities into the PAA, the extension of roads and transportation corridors from Jackson into the PAA, and the style of the development occurring within the PAA.  The chancellor also took into account the fact that the revised annexation area is immediately adjacent to the city limits.  The chancellor found new subdivisions had developed on the fringe of Jackson's city limits with neighborhoods literally split between Jackson and unincorporated Hinds County.

¶87.    The chancellor's opinion clearly shows that he considered the three most important factors: adjacency, accessibility, and spillover growth. *See Winona*, 879 So. 2d at 977.  The chancellor correctly found that Jackson's economic investment in the PAA supports annexation of the revised area.  This Court previously has found that the extension of water and sewer services evidences a path of growth.  *See Hattiesburg*, 840 So. 2d at 86; *In re Enlargement & Extension of the Mun. Boundaries of Madison v. City of Madison*, 650 So. 2d 490, 497 (Miss. 1995). While Jackson has invested infrastructure in much of the PAA/PIA, this investment does not justify annexation of the entire PAA.  The chancellor appropriately considered Jackson's path of growth in light of the competing petition for Byram's incorporation.  The chancellor had an opportunity to view the PAA, and he found

34

the four-square-mile area to be an extension of Jackson. We conclude that the chancellor's findings as to this factor are supported by substantial evidence.

**Factor 3: The potential health hazards from sewage and waste disposal in the PAA.**

¶88. This Court has set forth the following factors the trial court may consider in determining whether potential heath hazards exist: "(1) potential health hazards from sewage and waste disposal; (2) a large number of septic tanks in the area; (3) soil conditions which are not conducive to on-site septic systems; (4) open dumping of garbage; and (5) standing water and sewage." *Winona*, 879 So. 2d at 979.

¶89. The parties do not dispute that potential health hazards exist in the PAA. The chancellor found that open dumping of garbage is a problem, and a large number of septic tanks exist in the PAA. The chancellor considered the competing petitions for incorporation and annexation and appropriately determined that Jackson and an incorporated Byram will be able to address the health hazards in the area. We find the chancellor did not commit manifest error in granting the annexation of the four square miles.

**Factor 4: Jackson's financial ability to make the improvements and furnish municipal services promised.**

¶90. This Court has set forth the following factors the trial court may consider in determining whether a municipality has the financial ability to provide municipal services:

(1) present financial condition of the municipality; (2) sales tax revenue history; (3) recent equipment purchases; (4) the financial plan and department reports proposed for implementing and fiscally carrying out the annexation; (5) fund balances; (6) the City's bonding capacity; and (7) expected amount of revenue to be received from taxes in the annexed area.

*Id.* at 980-81.

¶91.   Jackson calculated the total projected cost of improvements and services in the PAA over a five-year period to be $14,933,979.  Jackson also calculated the projected revenue for the same period to be in excess of $20,000,000.  Jackson asserts the annexation of the PAA will pay for itself.

¶92.   Jackson points this Court to expert testimony that Jackson historically has enjoyed a positive fund balance.  Jackson further asserts that its bonding capacity and bond ratings reflect the city's good financial health.  Jackson's capacity for further debt is $85,037,466 under the Fifteen-Percent Rule and $121,812,458 under the Twenty-Percent Rule. Jackson's bond rating is A from Standard and Poor's and A1 from Moody's.

¶93.   BI contends that Jackson has failed to provide an appropriate level of services to its citizens.[14]  BI points to evidence that Jackson has failed to hire a recommended level of police officers.  BI also points to testimony that Jackson needs to increase revenue by broadening its tax base.  The Objectors argue the record is devoid of evidence that the revised PAA will pay for itself upon annexation.

¶94.   After due consideration of the evidence under this factor, the chancellor found that Jackson's annexation of four square miles is financially feasible.  Conversely, the chancellor determined that annexation of the entire PAA would place a financial strain on Jackson.  The

_____

[14]Both BI and the Objectors reference case law in which this Court has noted Jackson's poor past performance in providing services to its citizens. *See In re Enlargement & Extension of Jackson v. City of Ridgeland*, 912 So. 2d 961 (Miss. 2005); *In re: Exclusion of Certain Territory from Jackson*, 698 So. 2d 490 (Miss. 1997); *In re Enlargement & Extension of Jackson v. City of Jackson*, 691 So. 2d 978 (Miss. 1997). These cases will be addressed under the past-performance factor.

chancellor reiterated that Jackson recently had annexed land (portions of Parcel 2 and 3), and Jackson will need to provide services and improvements to those areas.

¶95.    While Jackson presented evidence it has the financial ability to provide services to the entire PAA, this evidence was appropriately considered by the trial court in light of Jackson's recent annexations. The record supports the chancellor's determination that the annexation of the revised PAA is financially feasible.

**Factor 5: The need for zoning and overall planning in the PAA.**

¶96.    The parties do not dispute that the PAA/PIA has a need for zoning and overall planning.[15]  Jackson contends the chancellor committed manifest error by ruling that incorporation will address the planning and zoning needs of the Byram area. The Objectors contend that an incorporated Byram will better address zoning and planning in the four-square-mile area.

¶97.    The chancellor determined the PAA has a need for zoning and overall planning. He concluded that the Hinds County ordinances are insufficient to meet the needs of the PAA/PIA. The chancellor concluded that Jackson and an incorporated Byram will be able to meet the need for zoning and planning in their respective areas.

¶98.    The chancellor appropriately considered the competing petitions and determined an incorporated Byram will be able to address the needs of a larger area and people. We find the

---

[15]We do not include the Industrial Center in this statement. The Industrial Center is governed by protective covenants and presented evidence that it does not have a need for further zoning and planning.

chancellor did not commit manifest error in reducing the PAA and allowing Jackson to annex the four square miles.

**Factor 6: The need for municipal services in the PAA.**

¶99.   This Court has set forth the following factors the trial court may consider in determining whether there is a need for municipal services:

> (1) requests for water and sewage services; (2) plan of the City to provide first response fire protection; (3) adequacy of existing fire protection; (4) plan of the City to provide police protection; (5) plan of City to provide increased solid waste collection; (6) use of septic tanks in the proposed annexation area; and (7) population density.

*Id.* at 984.

¶100.  The parties do not dispute that the PAA is in need of municipal services.[16]  Jackson, however, contends that it has the ability to better serve and provide municipal services to the area's residents.  According to Jackson, it plans to provide the PAA six police officers, two beats, and two fully equipped police vehicles.  Jackson also contends that the PAA will benefit from its Class 3 fire rating, and it plans to add a fire station, a pumper truck, a ladder truck, and twenty-one firefighters to the PAA.  Jackson further plans to increase waste collection in the PAA to twice a week and purchase an additional trash hauler and truck.

¶101.  BI contends that Jackson seeks to provide services to portions of the Byram area that will financially benefit Jackson.  The Objectors assert that the Jackson Police Department (JPD) is understaffed with only 486 sworn officers, and of that number, 100 officers are

---

[16]We do not include the Industrial Center in this statement.  The Industrial Center presented evidence to the trial court that current services are sufficient to meet its needs.

38

detectives and not beat-patrol officers. The Objectors also argue that the Jackson Fire Department has forty-seven vacancies to fill.

¶102. The chancellor reiterated his previous finding that the PAA/PIA has a need for municipal services. He cited Sheriff McMillin's testimony that the PAA has seen an increase in crime and traffic over the last several years. The chancellor also relied on the testimony of Sheriff McMillin and Daryl Smith, a JPD Deputy Chief, that the PAA is need of municipal police protection. The chancellor also found the PAA is in need of municipal fire protection, as the Byram Volunteer Fire Department serves nearly seventy-four square miles with one station. The chancellor also cited expert testimony that Jackson plans to increase waste pickup from once a week to twice a week. While the chancellor found that JPD is understaffed, he concluded JPD could handle the four-square-mile area. The chancellor found that Jackson has the ability to provide municipal services to the four-square-mile area, but not the entire PAA.

¶103. The chancellor's findings as to this factor are supported by the record. The chancellor properly concluded that Jackson's resources would be stretched too thin with the annexation of more than twenty square miles. Of particular note, the PAA has a great need of increased police and fire protection, and Jackson has yet to meet the budgetary and staffing needs of these two departments.

¶104. Conversely, the evidence supports the annexation of the revised PAA. Jackson has in place several fire stations in close proximity to the revised PAA that will be able to provide municipal fire services. Additionally, Jackson's crime rate has been declining over

39

the last several years. Jackson's annexation of four square miles should not strain JPD, especially since Jackson plans to add additional police officers upon annexation.

**Factor 7: Whether there are natural barriers between Jackson and the PAA.**

¶105. This factor was addressed *supra* under incorporation. There are no natural barriers between Jackson and the PAA.

**Factor 8: The past performance and time element involved in Jackson's provision of services to its present residents.**

¶106. Jackson contends that it provides numerous municipal services to its current residents, including: the best-rated fire protection in Mississippi, zoning and planning, police protection, trash collection twice a week, road maintenance, code enforcement, and cultural and recreational services. BI and the Objectors contend Jackson has a history of poor past performance in rendering municipal services, and they cite *In re: Exclusion of Certain Territory from Jackson v. City of Jackson* ("*Exclusion of Certain Territory*"), 698 So. 2d 490 (Miss. 1997), in support of their argument.

¶107. In *Exclusion of Certain Territory*, residents sought deannexation from the City of Jackson. *Exclusion of Certain Territory*, 698 So. 2d at 491. The Court granted deannexation, in part, due to Jackson's poor past performance in rendering services to the area. *Id.* at 494-95. The Court found:

> [Jackson] is unable or unwilling to expend the necessary funds to provide the services and infrastructure promised within the area. This is clear in that no action has been taken toward providing sewer services in the area. In addition, the City of Jackson has failed to build the promised fire station. It is clear from the projected cost of providing these services, the City is not likely to provide these services in the near future . . . . In addition, this Court

40

is greatly concerned with the extreme delay and past performance of the [C]ity in the provision of services to its present residents and to the new residents.

*Id.* at 494-95; *see **In re Enlargement & Extension of Jackson v. City of Jackson***, 691 So. 2d 978, 984 (Miss. 1997) (detailing Jackson's "past performance of failing to furnish the promised improvements to the 1976 and 1989 annexed areas").

¶108.  BI also relies on ***In re Jackson v. City of Ridgeland*** to support its contention that Jackson has broken its promise to provide additional police officers to protect Jackson residents.  ***City of Ridgeland***, 912 So. 2d 961, 969 (Miss. 2005).  In ***City of Ridgeland***, Jackson sought to annex, and the trial court approved, a certain parcel of land that included the Richmond Grove area and the 220 Business Park.  *Id.* at 964.  On appeal, Madison County and the City of Ridgeland contended the trial court erred in allowing Jackson to annex the 220 Business Park, and Jackson argued it was entitled to annex the entire parcel. *Id.*

¶109.  Upon a review of the evidence, this Court found:

> Jackson needs over 230 additional policemen to reach recommended levels of protection according to the Linder/Maple report.  Jackson's then-Mayor testified that Jackson does not have enough police officers to meet the needs of Jackson residents.  Then-Jackson Police Chief Bracy Coleman testified that Jackson already has a problem with the amount of crime in the city and that the police department was understaffed . . . . Jackson's budget of roughly $28 million would require a dramatic increase of approximately $7 million to fund the additional officers.

*Id.* at 969.  This Court upheld Jackson's annexation of Richmond Grove but found the trial court committed manifest error in granting the annexation of the 220 Business Park. *Id.* at 972.

¶110. The chancellor found that Jackson had failed to present sufficient proof of the provision of services to previously annexed areas. We agree. "This Court evaluates this indicium by looking at the municipality's performance in previous annexations and whether it has provided promised services to its residents." *Id.* at 969. Jackson failed to present evidence regarding the provision of services to previously annexed areas. Instead, Jackson presented evidence of municipal services it generally provides to all of its residents. The record supports the chancellor's finding that Jackson failed to present sufficient evidence to support this indicium.

**Factor 9: The impact (economic or otherwise) of the annexation upon those who live in or own property in the area proposed for annexation.**

¶111. Jackson contends that annexation will have a positive impact on the residents of the PAA. Jackson argues that it will provide the PAA much-needed services. Conversely, the Objectors argue that an incorporated Byram will provide them municipal services with a localized government and a lower millage rate. The Industrial Center asserts that it would not realize any benefits from its inclusion in the annexation area. The Industrial Center further asserts that annexation would negatively impact its future expansion, and current businesses would relocate due to municipal taxation.

¶112. In his opinion and order, the chancellor cited *In re Extension of the Boundaries of Hattiesburg v. City of Hattiesburg*, for the proposition that residents of annexed areas should receive something of value for their tax dollars. *Hattiesburg*, 840 So. 2d 69, 82 (Miss. 2003). The chancellor found that residents in the revised PAA will enjoy municipal police protection, fire protection, garbage collection, and decreased insurance rates. He also

42

concluded that residents in the revised PAA will enjoy enhanced street and ditch maintenance, economic development services, housing and community development, and zoning and subdivision regulations.

¶113. The chancellor also cited *In re Enlargement of the Corporate Limits & Boundaries of Gulfport v. City of Gulfport*, where this Court stated "[b]ecause extension of the corporate limits of any municipality does seriously affect property owners in their daily lives, this Court . . . has never taken these objections lightly." *Gulfport*, 627 So. 2d 292, 294 (Miss. 1993). The chancellor emphasized the fact that Jackson did not produce one resident at trial who supported annexation, but numerous residents testified in favor of incorporation.

¶114. The chancellor's findings as to this indicium are supported by the record. Upon annexation, the Objectors will receive various municipal services in exchange for their tax dollars.

**Factor 10: The impact of the annexation upon the voting strength of protected minority groups.**

¶115. The chancellor found, and the parties do not dispute, that annexation will not dilute the voting strength of any protected minority group. In support of his ruling, the chancellor noted that Jackson was seventy-one percent African-American with 130,000 minority citizens as of 2000. The chancellor stated "[t]he voting strength of African-Americans would not be adversely impacted by the less than 4,500 white residents residing in the proposed annexation area and will not be adversely impacted by the even smaller revised annexation area as set forth by this Court." The chancellor further noted that no party raised this issue at trial.

43

¶116. We have ruled "this indicium should not generally be afforded great weight in those cases where it is not raised by a party with standing." *In re Extension of the Boundaries of Columbus v. City of Columbus*, 644 So. 2d 1168, 1180 (Miss. 1994). As noted by the chancellor, no party raised this indicium at trial. Furthermore, the record supports the chancellor's findings as to this factor.

> **Factor 11: Whether the property owners and other inhabitants of the areas sought to be annexed have in the past, and for the forseeable future unless annexed will, because of their reasonable proximity to the corporate limits of the municipality, enjoy the (economic and social) benefits of proximity to the municipality without paying their fair share of the taxes.**

¶117. Jackson contends the residents of the PAA receive numerous benefits without paying their fair share of taxes. Jackson argues its water supply has allowed the PAA to benefit from a reduced fire rating (Class 7). Jackson also argues the PAA has benefitted from its investment in water and sewer infrastructure. Jackson asserts the residents in the PAA participate in activities provided by the Jackson Parks and Recreation Development. Jackson also argues the residents benefit from mutual-aid fire protection in addition to hospitals, government seats, and public facilities that are located in Jackson.

¶118. BI contends the residents of the PAA pay Jackson for the water and sewer services they receive, and utility services are not tax-supported functions. The Objectors argue the evidence in support of this indicium is generalized, and this Court condemned such generalizations in *In re Jackson v. City of Ridgeland*, 912 So. 2d 961, 971 (Miss. 2005). In *City of Ridgeland*, this Court discussed factor eleven and found:

44

> The City of Jackson offered generalized evidence to suggest that property owners in the PAA enjoy the benefits of Jackson without having to pay taxes for those benefits. Although one might argue that the proximity of the PAA to Jackson provides area residents with medical facilities, museums, parks, etc., this argument is without merit. No specific proof was forthcoming and the failure to develop the record to support this issue lies with Jackson.

*Id.*

¶119. The chancellor found that residents in the four-square-mile area benefit from their proximity to Jackson without paying their fair share of taxes. Jackson introduced specific evidence that residents in the PAA do receive *some* benefits without paying their fair share of taxes. Specifically, Jackson provides mutual-aid fire protection, and its water infrastructure has greatly helped the area obtain a Class 7 rating. James Elliott, a professional engineer and city planner, testified that Jackson has upgraded its waterworks infrastructure in the PAA to provide larger water lines. Elliott explained that these water lines "provide and furnish large quantities of water at high pressures in the area." He characterized the water lines as an "unusual benefit" since the water supply positively affects the PAA's fire rating.[17] Jackson has also placed a number of fire hydrants in the PAA, and these fire hydrants positively affect the fire rating. We find that the chancellor's ruling as to this indicium is supported by substantial evidence.

**Factor 12: Any other factors that may suggest reasonableness vel non.**

¶120. Jackson asserts that it is the "political and economic heart" of the state. Furthermore, Jackson argues that it is the center of the state's medical and cultural communities. Jackson

---

[17]According to Elliott, fire ratings are largely based on water supply. Ratings are also based on fire stations, equipment, personnel, and number of fire hydrants.

points to the fact that various hospitals and institutions of higher learning are located in Jackson. Jackson further argues that its investment in the PAA's infrastructure warrants annexation.

¶121. The chancellor found the annexation of the revised area was reasonable based on Jackson's status as the capital city. However, the chancellor concluded that other factors weighed against annexation of the entire PAA. Namely, annexation of the entire PAA would "strip the tax base of the Byram area and would have the effect of splitting the Byram community and leaving over 7,000 people without municipal services." The chancellor concluded that this factor weighed "heavily" against annexation of the entire PAA.

¶122. This Court has held that the "financial and governmental role" of Jackson is "neither a super-factor nor an independent dispositive test." *Id.* at 971. We find the chancellor's findings as to this factor are supported by substantial evidence. The chancellor appropriately revised the PAA and granted BI's petition to incorporate, thus allowing more residents to obtain needed municipal services.

**Summation on the issue of whether the annexation of the revised PAA is reasonable.**

¶123. The chancellor properly considered each of the twelve factors set out in *Winona* pertinent to the reasonableness of the proposed annexation. We reiterate that all twelve factors must be considered and no one factor is dispositive of reasonableness. *Winona*, 879 So. 2d at 972-73. When considered under the totality of the circumstances, the twelve factors support the chancellor's order allowing annexation of the revised PAA. We further find

46

substantial evidence to support the chancellor's determination that annexation of the entire PAA is unreasonable. This Court affirms the chancellor's grant of annexation.

## CONCLUSION

¶124. The history of this litigation has been lengthy and often contentious. The scope of our judicial review is limited. The chancellor conducted a lengthy trial over the course of several months listening to testimony that stretches to more than twenty-two volumes. The chancellor conducted a personal inspection of the entire area and entered a very thorough forty-nine-page opinion.

¶125. This Court finds the chancellor appropriately considered all applicable factors and weighed the evidence regarding incorporation and annexation. The chancellor's findings are without manifest error and are supported by substantial evidence. We affirm the chancellor's grant of incorporation and annexation.

¶126. **AFFIRMED.**

**WALLER, C.J., CARLSON AND GRAVES, P.JJ., DICKINSON, RANDOLPH, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR.**