# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2019-AN-00733-SCT

*IN THE MATTER OF THE ENLARGING,
EXTENDING AND DEFINING THE CORPORATE
LIMITS AND BOUNDARIES OF THE CITY OF
CANTON, MADISON COUNTY, MISSISSIPPI
AND IN THE MATTER OF THE
INCORPORATION OF THE CITY OF
GLUCKSTADT, MISSISSIPPI: PECO FOODS,
INC., KINGSTON PLACE, LLC, KINGSTON
PLACE II, LLC, RCT, LLC, LULA B. COVINGTON,
LP, AND LLM, INC.*

*v.*

*CITY OF CANTON, MISSISSIPPI AND RON
HUTCHINSON*

*v.*

*GLUCKSTADT INCORPORATORS*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/10/2019 |
| TRIAL JUDGE: | HON. JAMES CHRISTOPHER WALKER |
| TRIAL COURT ATTORNEYS: | JERRY L. MILLS |
| | JOHN PRESTON SCANLON |
| | J. CHADWICK MASK |
| | JACOB THOMAS EVANS STUTZMAN |
| | DALE DANKS, JR. |
| | MICHAEL VERDIER CORY, JR. |
| | C. R. MONTGOMERY |
| | JOHN PRINCE MARTIN |
| | JOHN ERNEST WADE, JR. |
| | SHELDON G. ALSTON |
| | WILLIAM DEMENT DRINKWATER |
| | JAMES H. HERRING |
| | JAMES MORTIMER CREWS, III |
| | KIMBERLY CELESTE BANKS |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CHANCERY COURT |

ATTORNEYS FOR APPELLANTS:   JOHN PRINCE MARTIN
                            SHELDON G. ALSTON
                            C. R. MONTGOMERY
                            WILLIAM DEMENT DRINKWATER
                            JOHN ERNEST WADE, JR.
ATTORNEYS FOR APPELLEES:     J. CHADWICK MASK
                            JERRY L. MILLS
                            JOHN PRESTON SCANLON
                            KIMBERLY CELESTE BANKS
                            JACOB THOMAS EVANS STUTZMAN
NATURE OF THE CASE:          CIVIL - MUNICIPAL BOUNDARIES &
                            ANNEXATION
DISPOSITION:                 ON DIRECT APPEAL: AFFIRMED.
                            ON CROSS-APPEAL: AFFIRMED -
                            05/06/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.     This appeal arises from two cases filed in the Chancery Court of Madison County, consolidated by the chancery court on its own order.  Petitioners from the community of Gluckstadt sought incorporation of approximately 10.8 square miles of incorporated territory in Madison County.  The City of Canton petitioned for annexation of approximately 6.7 square miles of unincorporated territory in Madison County, consisting of five proposed areas (Areas 1, 2, 3, 4, and 5).  The chancery court entered a final decree, granting, in part, the Gluckstadt Incorporators' petition.  The decree granted Canton's proposed annexation of Areas 1 and 2 but denied Canton's proposed annexation of Areas 3, 4, and 5.

¶2.     Canton and Ron Hutchinson (Incorporation Objectors) appeal the chancery court's grant of incorporation, claiming the chancery court lacked jurisdiction over the incorporation

2

petition because it did not include two-thirds of the signatures of the qualified electors residing in the proposed incorporation area. Various citizens (Annexation Objectors) appeal the chancery court's grant of annexation of Areas 1 and 2. Canton cross-appeals the chancery court's denial of annexation as to Areas 3, 4, and 5.

¶3. Finding no manifest error with the chancery court's final decree in both cases, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶4. On January 31, 2017, the Gluckstadt Incorporators filed a petition seeking to incorporate a new City of Gluckstadt. Subsequently, Canton filed its own petition for annexation on February 13, 2017. There was some overlap between the territory sought to be incorporated as Gluckstadt and the territory sought for annexation by Canton. The proposed incorporation area (PIA) consists of 10.8 square miles in Madison County, 1.1 square miles of which Canton also sought to annexed.

¶5. The chancellor consolidated the cases and then bifurcated the matter into two separate trials, the first trial for purely jurisdictional purposes related to the incorporation and the second on the merits of both the incorporation petition and the annexation petition.

¶6. The chancellor found that the jurisdictional requirements were met and that the City of Gluckstadt should be incorporated, but he reduced the total amount of territory sought by the Incorporators. The chancellor also awarded Canton annexation in Areas 1 and 2 but denied annexation as to Areas 3, 4, and 5.

¶7. The Incorporation Objectors appeal the chancery court's grant of incorporation. The Annexation Objectors appeal the chancery court's annexation of Areas 1 and 2, and Canton cross-appeals the chancery court's denial of annexation as to Areas 3, 4, and 5.

## INCORPORATION

### Standard of Review

¶8. "This Court reviews the chancellor's findings for manifest error as to whether a petition for incorporation is legally sufficient." *City of Jackson v. Byram Incorporators*, 16 So. 3d 662 (Miss. 2009) (citing *City of Pascagoula v. Scheffler*, 487 So. 2d 196, 199 (Miss. 1986)). "In explaining the standard of review, this Court has stated that it 'cannot overturn the decree of a chancellor unless it finds with reasonable certainty that the decree is manifestly wrong on a question of law or interpretation of facts pertaining to legal questions.'" *Id.* (quoting *Scheffler*, 487 So. 2d at 200).

¶9. "Petitioners for incorporation have the burden to prove sufficiency of the petition." *Fletcher v. Diamondhead Incorporators*, 77 So. 3d 92, 95 (Miss. 2011) (citing *Boling v. City of Jackson (In re City of Pearl)*, 279 So. 2d 590, 592 (Miss. 1973)). The requirements of Mississippi Code Section 21-1-13 "must be strictly complied with." *Myrick v Incorporation of Stringer*, 336 So. 2d 209, 210 (Miss. 1976) (citing *City of Jackson v. Boling*, 241 So. 2d 359 (Miss. 1970)).

**Whether the Gluckstadt Incorporators' petition contained the signatures of two-thirds of the qualified electors residing in the proposed incorporation area as required by Mississippi Code Section 21-1-13.**

¶10.    Mississippi Code Section 21-1-13 sets forth eight jurisdictional requirements for a petition seeking the incorporation of a new municipality.  Miss. Code Ann. § 21-1-13 (Rev. 2015).  Specifically at issue in this appeal is that a petition for incorporation "shall be signed by at least two-thirds of the qualified electors residing in the territory proposed to be incorporated." Miss. Code Ann. § 21-1-13(3) (Rev. 2015).

¶11.    The chancellor noted in his order that all other requirements were not actively contested by the Incorporation Objectors, and, thus, the requirement primarily disputed was the signatures of two-thirds of the qualified electors residing in the PIA as of the date of the filing of the initial petition on January 31, 2017.  The chancellor ultimately found, however, that all statutory requirements for the trial court's jurisdiction were proved by the Incorporators by a preponderance of the evidence.

¶12.    Canton and Mac Haik (who is no longer a party to these proceedings) sought interlocutory appeal and a stay of the remaining merits trial.  This Court denied both, and the matter proceeded to trial on the merits. The Incorporation Objectors now appeal as to jurisdiction with regard to the incorporation.

¶13.    The Incorporation Objectors present three arguments that the trial court lacked jurisdiction to hear the incorporation matter. First, the Incorporation Objectors argue that the amended petition is not signed by any qualified electors because the signatures were not attached to the amended complaint.  Second, the Incorporation argue, even if the Court looks to the original petition, the Incorporators failed to capture a complete January 31, 2017 voter roll, so it is unknown how many qualified electors resided in the PIA as of the petition date.

5

Last, the Incorporation Objectors argue that the chancellor wrongly concluded that 140 voters appearing on the Madison County voter rolls had moved, died, or otherwise were unqualified to vote. We address each argument in turn.

¶14.     First, the Incorporation Objectors contend that the Incorporators' petition is not signed by any qualified electors.  The Incorporators first filed their petition, which had attached numerous pages of signatures, on January 31, 2017.  The City of Canton filed a motion to dismiss the Incorporators' initial petition on the basis that the metes-and-bounds legal description did not match their own map or accurately reflect the boundaries proposed to constitute the new city.  The Incorporators filed a motion to amend, which the chancellor granted, and the Incorporators then filed their amended petition.

¶15.     The Incorporation Objectors contend that the amended petition is flawed because it did not contain signatures.  Further, the amended petition does not refer to, adopt, or incorporate by reference the original petition, and the amended petition is not signed by any qualified electors.  The Incorporation Objectors quote the following: "[A]n amended complaint superseded the original complaint and renders it of no legal effect unless the amended complaint specifically refers to and adopts or incorporates by reference the earlier pleading." *Sledge v. Grenfell Sledge & Stevens, PLLC*, 263 So. 3d 655, 661 (Miss. 2018) (internal quotation marks omitted) (quoting *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam)).

¶16.     In *Sledge*, Sledge was dismissed from his firm and sued. *Id.* at 659. After Sledge filed his original complaint, the firm moved to dismiss under Mississippi Rule of Civil Procedure

12(b)(6), which the court granted. *Id.* at 661. Sledge then filed an amended complaint, which the parties litigated and was the subject of the appeal. *Id.* at 662. On appeal, Sledge argued the trial court erred by dismissing his original complaint. *Id.*

¶17. This Court held that the dismissal of Sledge's original complaint was not proper for appeal. *Id.* Sledge filed an amended complaint, which contained an identical request and proceeded to fully litigate the amended complaint. *Id.* He never attempted to file an appeal of the dismissal of the original complaint. *Id.* Further, he fully acquiesced to the dismissal and filed his amended complaint. *Id.* "Since Sledge filed an amended complaint and since his original complaint was superseded by his amended complaint, the issue is moot because nothing exists for the Court to reinstate should the trial court have erroneously dismissed the complaint." *Id.* at 661-62.

¶18. Here, the Incorporators did not abandon the first complaint. The Incorporators brought a motion for leave of court under Mississippi Rule of Civil Procedure 15(a) to amend their petition for the sole and limited purpose of correcting the legal description to match the map. The chancellor's order granting the Incorporators' motion specified that limited purpose of the amendment.

¶19. This Court has held that corrections that were at best technical deficiencies were amendable in accordance with Rule 15(a). *Schmidt v. City of Jackson (In re City of Ridgeland)*, 494 So. 2d 348, 354 (Miss. 1986). The rule provides that an amendment relates back to the original pleading. Miss. R. Civ. P. 15(c).

¶20.     In ***Byram Incorporators***, the incorporators filed two petitions for incorporation, one in 2002 and one in 2003. ***Byram Incorporators***, 16 So. 3d at 673. The second petition did not include the third page, which was included in the first petition. ***Id.*** When the Incorporators amended their petition, they included page three to cure the error. ***Id.*** Jackson argued, as Hutchinson argues here, that the amended complaint could not be cured. ***Id.*** The ***Byram*** Court held that the Incorporators "failure to include page three *when filed* was a clerical error, not a failure to comply with the specific requirements of Section 21-1-13." ***Id.***

¶21.     Likewise, the Incorporators' failure to attach the signatures to the amended complaint was not a failure to comply with the statutory requirements but simply a matter of curing a small error of the map description. Here, the amended petition referred back multiple times to the earlier petition filed, which included the numerous lists of signatures. We are unpersuaded by this argument.

¶22.     Second, the Incorporation Objectors contend that even if the Court counts the signatures from the original petition, the Incorporators still failed to obtain the necessary signatures. The Incorporation Objectors present two arguments as to the signatures: (1) it is impossible to know the number of qualified electors because of the missed voters in reconstructing the voter roll, and (2) the chancellor erred by concluding that some voters were disqualified.

¶23.     "This Court has held that, if the chancery court determines that a petition does not contain the requisite number of signatures, it must dismiss the petition for lack of jurisdiction." ***Fletcher***, 77 So. 3d at 95 (citing ***Myrick***, 336 So. 2d at 211).

¶24. The Court has set forth the manner for determining compliance with the two-thirds requirement:

> "[T]he question of whether the two-thirds requirement . . . has been met must be determined by an ascertainment of the number of persons living in the area to be annexed who were registered voters and then determining whether two-thirds of that number have signed the complaint."

*Fletcher*, 77 So. 3d at 95-96 (quoting *In re City of Ridgeland*, 494 So. 2d at 352).

¶25. In determining the registered voters, a certified copy of the voter roll is the undisputed starting point, and a voter's address on the roll is the "most viable record" of whether a voter resided in the PIA on the date of filing. *Fletcher*, 77 So. 3d at 95-96 (quoting *Scheffler*, 487 So. 2d at 200).

¶26. The year before filing, the Incorporators obtained a voter roll from Madison County before they began collecting signatures and canvassing PIA neighborhoods. Volunteers were provided workbooks, which contained the names and addresses of individuals appearing on the 2016 Madison County voter rolls with addresses inside the PIA. Volunteers went door to door gathering signatures. The workbooks contained notes sections, which allowed the volunteers to annotate information they learned during the canvassing process. The information in the workbooks was then shared with the Incorporators' expert Chris Watson, who oversaw the process and determined compliance with the two-thirds requirement.

¶27. On the date of the filing of the petition, the Incorporators had requested a complete voter roll for the purposes of comparing the two to ensure they had captured a sufficient number of signatures. However, Madison County had not in fact provided a complete voter

9

roll. Voter rolls contain three categories of voters: active, inactive, and purged voters.[1] It is undisputed that qualified electors include active and inactive voters.[2]

¶28. The voter roll provided by Madison County on the date of the Incorporators' initial filing was incomplete because it did not contain the inactive voters. This was brought to the Incorporators' attention in August 2017, at which time the Incorporators obtained a third and complete voter roll.

¶29. At the jurisdictional trial, both the Incorporators' expert and the Objectors' expert reconstructed the voter roll and presented their findings. It was undisputed that the Incorporators obtained 1,145 countable signatures. After a six-day trial of witnesses testifying about individual voters, the chancellor found that the Incorporators had presented substantial evidence that the petition contained two-thirds of the signatures of the qualified electors residing in the PIA.

¶30. The Incorporation Objectors contend that due to the mistake, it is completely impossible to reconstruct a complete January 31, 2017 voter roll and to determine the two-thirds requirement if the total number of the qualified electors is unknown. Furthermore, the

---

[1]A purged voter is someone who has died or moved away or changed their registration. Note, there is no disagreement, that if an inactive voter is still on the voter roll, that vote counts as a qualified elector if he or she resides within the territory, a purged voter does not.

[2]Madison County Election Commissioner Timothy Jenkins explained the process by which voters are designated inactive. An inactive voter is a registered voter flagged inactive in the system because the Madison County Election Commission has some indication that the voter should no longer be qualified as an elector. A voter believed to no longer reside at their registered address would cause an inactive designation. Voters are classified as inactive when the election commission has reasons to believe the voter is erroneously on the voter roll.

chancellor wrongly concluded that 140 voters were disqualified. The question before this Court is whether the chancellor committed manifest error by finding the two-thirds requirement met.

¶31. At trial, the parties agreed that, not counting the missing voters, there were 2,086 voters on the Madison County voter rolls with addresses inside the PIA. Therefore, in order to satisfy the signature requirement, the Incorporators were required to prove that at least 368 of these citizens had moved or were ineligible to vote. While voter rolls are the most viable evidence, this Court has also held it is not the most conclusive evidence. *Fletcher*, 77 So. 3d at 95-96 (citing *Scheffler*, 487 So. 2d 196). Because voter rolls may not be updated in real time, citizens seeking incorporation may offer evidence that voters appearing on the voter rolls have died, have moved, or otherwise have become ineligible to vote.

¶32. In obtaining signatures from the active voter roll and reconstructing the inactive-voter roll, Watson used the same methodology as was used in *Fletcher* and *Scheffler*. In *Scheffler*, the incorporators of the City of Gautier canvassed the relevant area and reviewed telephone books, utility-consumer rolls, and postal lists to determine the number of qualified electors in the area. *Scheffler*, 487 So. 2d at 200. Then, the incorporators aided the commissioner of elections in removing from the voter rolls the names of persons who had died or moved away. *Id.*

¶33. In *Fletcher*, Chris Watson, the same expert as in this case, "offered expert testimony that the Incorporators had used reliable methods to compile the database, and that the numbers in [the summary tabulation of qualified voters in the PIA] were accurate." *Fletcher*,

11

77 So. 3d at 95-96. The *Fletcher* Court held that the Incorporators obtained the requisite number of signatures when they "offered evidence that thirty-five lived in the precincts but outside the proposed incorporation area[,] . . . that 1,891 persons had died, moved away, or should have been purged from the voter rolls, leaving 4,645 qualified electors residing in the proposed incorporation area at the time the petition was filed." *Id.*

¶34. Similarly, Watson received a copy of the voter roll, reduced the number of voters to those with addresses in the PIA, and had volunteers go door to door, work in workbooks, and annotate statuses such as moves, deaths, etc. He scrutinized the data as shown by various emails in the record and cross-referenced any voters from the roll with information from the secretary of state's office.

¶35. Watson determined that 464 qualified electors moved away, fourteen died, forty-five were obsolete, and nine should not be counted for other reasons, totaling 532 voters to be removed from the total number resulting in 1,563 qualified electors and 1,155 signatures, 73.90 percent. The Incorporation Objectors' expert, Dr. Hey, determined that three of Watson's fourteen had died, 254 of Watson's 464 moved away, and eight of Watson's forty-five are obsolete.

¶36. The chancellor, in his own analysis based on all the testimony presented, accepted the Incorporators' methodology of accounting for the known voters by canvassing the area and the unknown voters by a process known as reverse engineering the voter roll. The chancellor found by preponderance of the evidence that 2,086 voters were on the roll in the PIA as of January 31, 2017.

¶37.    Specifically, the chancellor concluded that 402 out of 464 moved away, ten out of fourteen died, eight obsoletes out of forty-five should not be counted, and five others out of nine should not be counted.  The trial court concluded that 1,661 qualified electors signed the petition for the incorporators, yielding 68.93 percent signatures.

¶38.    The chancellor then calculated the margin or cushion of qualified electors as fifty-seven, meaning there would have to be fifty-seven voters missing from the inactive roll to upset the two-thirds requisite.  The Incorporation Objectors contend that fifty-seven is speculative and that neither expert testified to an exact number.

¶39.    The chancellor noted that the inactive-voter roll the year before this petition contained 139 voters, so if the Court were to find that fifty-seven people were "languishing on an inactive voter list . . . the court would also have to find that the inactive list of 2017 was approaching 300 people."  The chancellor further found that "[e]ven Dr. Hey testified that inactive lists typically decrease after a federal election, which occurred in November 2016, just a few months before this petition was filed.  Therefore, the Court does not find that the inactive voter roll would more than double following a federal election."

¶40.    Lastly, the Incorporation Objectors argue that the Incorporators failed to prove that the "move-aways" had indeed moved outside of the PIA before January 31, 2017.  Similarly, Canton contends that the chancellor applied a new methodology contrary to the evidence to support move-aways, despite not knowing where they moved.

¶41.    The Incorporators' proof consisted of either (1) a mark in a citizen notebook that someone had moved; (2) a deed showing a citizen on the voter roll with an address in the PIA

13

had sold or lost the property at that particular address in the PIA; (3) personal investigations performed by the election commissioner showing that the voter was no longer residing or voting at the registered address; and (4) a variety of other evidence establishing the voter moved.

¶42. The chancellor used a methodology based on the rationale used by the Mississippi County Election Commission, as well as that used throughout the state, when attempting to purge voters. The chancellor found "that the Election Commission's underlying concept of not residing at the registered address, plus a period of non-voting, is used as the appropriate standard for finding that a voter should not be a registered voter within Madison County."

¶43. The method is as follows: If the Incorporators had what the testimony defined as a triggering event like the voter had moved from that address, i.e., one of the indications noted above in the workbooks, the court considered that to be some indication the voter likely moved out of the PIA before January 31, 2017. Then, the court looked at whether the voter had voted in election years 2015 and 2016, which included both presidential and gubernatorial elections, which are high-volume elections. If the voter had not voted then, the Court found by a preponderance of the evidence that the voter had indeed moved out of the PIA prior to the filing date and was not a qualified elector.

¶44. The Incorporation Objectors argue that this proof is unreliable and insufficient to establish a voter no longer lived in the PIA on the date the petition was filed. The Incorporators contend that the Incorporation Objectors are holding them to a higher standard of proof than is required.

¶45. The Incorporators show that the Incorporation Objectors' expert applied the wrong standard of proof when suggesting that proof of a moved voter had to be "ironclad" or "conclusive." The Incorporators contend that the proof they have to put on is that it was more likely than not that such individuals moved away from the PIA, not that it was a certainty.

¶46. It is well-established by this Court that voter rolls may be inaccurate, so the voter roll is not conclusive evidence. *Scheffler*, 487 So. 2d at 199. This is, of course, the difficult challenge to citizens when wishing to incorporate. Here, the Incorporators used additional information to assess their data. It has already been established that substantial compliance is the actual requirement, and the chancery court can only be overturned upon a showing of manifest error. *Id.*

¶47. We do not find manifest error. The chancellor's finding was based upon the proper legal standard: preponderance of the evidence, or more likely than not. The amended petition was not defective, and the chancellor did not commit manifest error by finding that the Incorporators had met the two-thirds requirement for signatures on their petition. While the numbers are not exact, Watson testified the process is fluid and even Dr. Hey's testimony changed as well upon hearing testimony that it is more likely than not that the Incorporators met the requirement. There was only one portion of the reconstructed voter roll that was unknown, and the chancellor determined a margin based on the evidence before him. Therefore, we affirm.

## ANNEXATION

15

**Standard of Review**

¶48. Annexations, by nature, are legislative affairs. *City of Petal v. Gulf S. Pipeline Co. (In re City of Petal)*, 301 So. 3d 591, 598 (Miss. 2020). Confirmation of annexations is placed within the province of the chancery court pursuant to Mississippi Code Section 21-1-33 (Rev. 2015), with the court's role in the matter limited to one question: "whether the annexation is reasonable." *City of Saltillo v. City of Tupelo (In re City of Tupelo)*, 94 So. 3d 256, 266 (Miss. 2012) (internal quotation mark omitted) (quoting *Bunch v. City of Jackson (In re City of Jackson)*, 691 So. 2d 978, 980 (Miss. 1997)). "This Court will not reverse the chancery court's findings as to the reasonableness of an annexation unless the chancellor's decision is manifestly wrong and/or is not supported by substantial and credible evidence." *Id.* (citing *Lamar Cnty. v. City of Hattiesburg (In re City of Hattiesburg)*, 840 So. 2d 69, 81 (Miss. 2003)).

¶49. To guide the chancery court's determination of reasonableness when evaluating a petition for annexation, this Court has provided a list of indicia factors. *City of Jackson v. City of Madison (In re City of Madison)*, 650 So. 2d 490, 494-95 (Miss. 1995). They "are not separate, independent tests which are conclusive as to reasonableness." *Id.* (citing *Western Line Consol. Sch. Dist. v. City of Greenville*, 465 So. 2d 1057, 1059 (Miss. 1985)). "Rather, these factors are 'mere indicia of reasonableness[,]'" with the ultimate determination being "whether the annexation is reasonable under the totality of the circumstances." *Id.* (internal quotation mark omitted) (quoting *Robinson v. City of Columbus (In re City of Columbus)*, 644 So. 2d 1168, 1172 (Miss. 1994)).

¶50. The list includes:

> (1) the municipality's need to expand, (2) whether the area sought to be annexed is reasonably within a path of growth of the city, (3) potential health hazards from sewage and waste disposal in the annexed areas, (4) the municipality's financial ability to make the improvements and furnish municipal services promised, (5) need for zoning and overall planning in the area, (6) need for municipal services in the area sought to be annexed, (7) whether there are natural barriers between the city and the proposed annexation area, (8) past performance and time element involved in the city's provision of services to its present residents, (9) economic or other impact of the annexation upon those who live in or own property in the proposed annexation area, (10) impact of the annexation upon the voting strength of protected minority groups, (11) whether the property owners and other inhabitants of the areas sought to be annexed have in the past, and in the foreseeable future unless annexed will, because of their reasonable proximity to the corporate limits of the municipality, enjoy economic and social benefits of the municipality without paying their fair share of taxes, and (12) any other factors that may suggest reasonableness.

*In re City of Tupelo*, 94 So. 3d at 266-67 (quoting *City of Horn Lake v. City of Southaven (In re City of Southaven)*, 5 So. 3d 375, 377 (Miss. 2009)). This Court has further held that municipalities must also "demonstrate through plans and otherwise, that residents of the annexed areas will receive something of value in return for their tax dollars in order to carry the burden of showing reasonableness." *In re City of Columbus*, 644 So. 2d at 1172.

¶51. As mentioned, Canton petitioned for annexation of approximately 6.7 square miles of unincorporated territory in Madison County, under Mississippi Code Section 21-1-27. (Supp. 2020). The proposed areas are divided into five parcels, as follows:

> **AREA 1**: An area of land located to the northwest of Canton, extending to Interstate 55 and including developments east and west of King Ranch Road, containing an estimated population of 3,500 persons, and including properties of objectors Kingston Place, LLC, Kingston Place II, LLC, RCT, LLC, Lula B. Covington, LP, and Millercorp, Inc.

17

**AREA 2**: An area of land located south of Fulton Street and extending to the northernmost boundary of Canton's 2017 annexation, containing an estimated population of 478 persons, and including properties of objectors Peco Foods Inc., LLM, Inc., and the Albert Langford and Willie Mae Langford Living Trust Dated May 27, 2009.

**AREA 3**: An area of land located predominately to the southwest of Canton, extending across Highway 22 to the north and as far south as Canton's 2007 annexation area around Sowell Road, containing an estimated population of 399 persons, and including property of objector Jubilee Company, Inc. ("Jubilee").

**AREA 4**: An area of land located predominately to the south of the current City, extending from I-55 to the east across Highway 51, containing an estimated population of eighty-nine persons.

**AREA 5**: An area of land that consists of roughly .2 acres along Calhoun Parkway located just southeast of Germantown High School. Area 5 is approximately eight miles south of the Canton Square and disconnected from the heart of Canton. The only part of Canton that touches Area 5 is land Canton annexed in 2006 for a particular development that never came to fruition ("NeuMarkt"). The NeuMarkt area itself is separated from the rest of Canton, connected to Canton only by Interstate 55, and remains largely undeveloped. Area 5 is entirely commercial in character with six businesses located there: Mississippi Tent and Party Rental (owned by objector Ron Hutchinson), Capitol Body Shop, Callaway's Yard and Garden Center, AT&T, and two Mac Haik car dealerships. No one lives in Area 5.

¶52. Applying the indicia factors of reasonableness, the chancery court approved annexation of Areas 1 and 2. The chancery court denied annexation of Areas 3, 4, and 5.

¶53. The Annexation Objectors claim that the evidence does not support the chancery court's approval of Areas 1 and 2. The Annexation Objectors primarily contest four of the indicia factors considered by the chancery court: (1) Canton's need for expansion; (2) Canton's financial ability to make the improvements and furnish the municipal services

18

promised for the annexation area; (3) Canton's past performance with prior annexations; and (4) fairness to the residents of the annexation areas.

¶54. The Annexation Objectors contend that Canton's vast available land resources, stagnant building activity, and declining population prohibit annexation similar to that found to be the case in *In re City of Jackson*, 691 So. 2d 978. They claim that Canton's declining finances cast doubt on its ability to make good on its promises to the affected citizens. They claim that Canton's poor history of past performance indicates that it cannot meet its citizens' needs. And they submit that Canton's annexation unfairly imposes a 56.32 millage rate on citizens who will not receive a fair benefit in return.

¶55. Canton maintains that the chancery court's approval of Areas 1 and 2 is reasonable considering the indicia of reasonableness under the totality of the circumstances. Canton, however, claims that the chancery court erred by denying its proposed annexation of Areas 3, 4, and 5. Canton submits that the undisputed facts show that (1) each of these proposed areas are in Canton's path of growth; (2) the undisputed evidence shows health hazards in Areas 3 and 4; (3) Canton has the financial ability to fund promised services and improvements in Areas 3, 4, and 5; (4) there is need for municipal services in each area; and (5) the economic-impact and fair-share indicia weigh in favor of annexation of each area.

¶56. Having reviewed and considered the extensive record on appeal, we find no manifest error in the chancery court's approval of proposed Areas 1 and 2 for annexation. Nor do we find manifest error in the court's denial of proposed Areas 3, 4, and 5 for annexation. The chancery court's application of the indicia factors for each area is supported by substantial

and credible evidence. We limit our discussion to those indicia factors challenged by the parties.

### Need for Expansion

¶57. This Court has enumerated a number of subfactors to consider when determining whether a city seeking an extension and enlargement has a reasonable need for expansion. These factors may or may not include:

> (1) spillover development into the proposed annexation area; (2) the City's internal growth; (3) the City's population growth; (4) the City's need for development land; (5) the need for planning in the annexation area; (6) increased traffic counts; (7) the need to maintain and expand the City's tax base; (8) limitations due to geography and surrounding cities; (9) remaining vacant land within the municipality; (10) environmental influences; (11) the city's need to exercise control over the proposed annexation area; and (12) increased new building permit activity.

*In re City of Tupelo*, 94 So. 3d at 272 (quoting *City of Horn Lake v. Town of Walls (In re City of Horn Lake)*, 57 So. 3d 1253, 1259 (Miss. 2011)).

¶58. As the Annexation Objector's rightly point out, the evidence presented shows that Canton has vast existing vacant land, along with stagnant building activity inside the current city limits, and a declining population. Canton currently consists of approximately 13,926 acres (21.76 square miles). Of these acres, 66.4 percent (9,240 acres or 14.44 square miles) are vacant and 40.4 percent (5,622 acres or 8.78 square miles) are vacant and without any development constraints.

¶59. Canton has experienced limited internal growth since 2012. Canton issued fifteen permits for new commercial construction and seventeen permits for new single-family residential development from 2012 to 2018. During this same time, however, Canton saw

a significant increase in multifamily residential development. Nine hundred and twenty-four permits were issued for the construction of multifamily dwelling units, for a total value of more than $50.2 million.

¶60.    As for population growth, Canton had a population of 13,189 according to the 2010 census. Canton's population has decreased to 12,800 according to the 2017 American Community Survey (ACS) data as reported to the United States Census Bureau.

¶61.    The chancery court agreed with the Annexation Objectors that Canton's ample supply of vacant land does not suggest a need to expand its boundaries. The chancery court also agreed that Canton's population decrease likewise does not support a need to expand. But, as this Court has held, such factors do not necessarily defeat annexation.

¶62.    As the chancery court noted, this Court has said, "the fact that vacant land remains in a city does not necessarily defeat annexation." *Hale v. City of Clinton (In re City of Clinton)*, 955 So. 2d 307, 315 (Miss. 2007) (internal quotation marks omitted) (citing *In re City of Hattiesburg*, 840 So. 2d at 85). We have "declined to set an absolute amount of usable vacant land that would prevent annexation." *Id.* (quoting *In re City of Hattiesburg*, 840 So. 2d at 85). This Court has upheld approved annexation in various cities such as "Southaven, Madison, and Ridgeland, which had usable vacant land of 43%, 59%, and 48%, respectively[.]" *Id.* (internal quotation marks omitted) (quoting *In re City of Hattiesburg*, 840 So. 2d at 85). This Court has further stated that "[e]very municipality that hopes to become a great city has a need for geographical expansion and, perhaps more important, for

21

a potential for expansion." *City of Jackson v. City of Ridgeland (In re City of Jackson)*, 551 So. 2d 861, 865 (Miss. 1989).

¶63. Similarly, this Court has held that population decreases do not prevent a city from annexing. *See Town of Marion v. City of Meridian (In re City of Meridian)*, 992 So. 2d 1113 (Miss. 2008) (affirming Meridian annexation despite decades long population decreases); *Byram Incorporators*, 16 So. 3d 662 (affirming Jackson annexation despite large population decrease over long period of time).

¶64. As found by the chancery court, other subfactors were demonstrated by Canton that established a clear need for Canton to expand into Areas 1 and 2. The chancery court heard testimony from Canton's urban and regional planning expert, Michael Slaughter, concerning "spillover" in Areas 1 and 2. In Area 1, there has been significant residential development that spilled over from Canton at a very dense level. There is an apartment complex with buildings dissected by Canton's current city-limits line, with buildings housing residents both in and out of the city limits. There are approximately 3,181 residents per square mile in Area 1, which could not exist without Canton utilities. Canton already provides domestic water, fire-protection water, and sewer services to large portions of Area 1.

¶65. Similarly, the court heard testimony that spillover exists in Area 2. Area 2 is completely surrounded by Canton. Area 2 is home to 478 people in an area that comprises .6 square miles. The vast majority of these people live in the West Side Mobile Home Park. West Side Mobile Home Park, Peco Foods, and a convenience store, among other developments, are immediately adjacent to the existing Canton city limits. Canton Municipal

22

Utilities provides both water and sewer services to Peco Foods, West Side Mobile Home Park, and other areas in Area 2. The Annexation Objectors' expert, Chris Watson, conceded that all of Area 1 and the developed portion of Area 2 are classic "cup runneth over" type of spillover from Canton.

¶66. Evidence was presented that the citizens in Areas 1 and 2 receive the benefit of water (both domestic water and fire-protection water), sewer services, electricity, natural gas, police response, fire response, and emergency response. But they do not pay *ad valorem* taxes to help Canton fund the large expenses incurred to provide the services. The chancery court noted that all of the dense development in Areas 1 and 2 exists in large part due to the availability of Canton services.

¶67. As for Areas 3, 4, and 5, the chancery court found no evidence of spillover development in these areas.

¶68. Given the substantial, credible evidence presented to the chancery court on this indicium factor, we cannot say that the chancery court's finding that this indicium weighed in favor of Canton's proposed annexation of Areas 1 and 2 was unreasonable. Likewise, we cannot say that the chancery court's finding was unreasonable that this indicium did not weight in favor of Canton's proposed annexation of Areas 3, 4, and 5.

**Path of Growth**

¶69. In determining this indicium, this Court has said that a city only need show that the proposed "area to be annexed is in *a* path of growth, not necessarily the most urgent or even the city's primary path of growth." *In re City of Jackson*, 551 So. 2d at 865. "Our law

23

grants municipalities the discretion, based upon their perception of the public convenience and necessity, to choose between the various paths of growth in enacting annexation ordinances." *Id.* (citing *Ritchie v. City of Brookhaven*, 217 Miss. 860, 65 So. 2d 436 (1953)). This Court has provided a number of subfactors to be considered for this indicium factor, such as:

> (1) spillover development in annexation area; (2) annexation area immediately adjacent to City; (3) limited area available for expansion; (4) interconnection by transportation corridors; (5) increased urban development in annexation area; (6) geography; and (7) subdivision development.

*In re City of Tupelo*, 94 So. 3d at 275 (citing *Neal v. City of Winona (In re City of Winona)*, 879 So. 2d 966, 977 (Miss. 2004)).

¶70. As mentioned, the chancery court found that significant spillover development exists in Areas 1 and 2. Area 1 is densely developed with both multifamily dwelling units and single-family residential developments. Urban development in Area 2 includes the densely populated West Side Mobile Home Park, Peco Foods, and Amigos Market. Area 3 includes residential development. Urban development in Area 4 includes Next Level Baseball, A and B Equipment Rental, Muha Body Shop, Suwanee River Pinestraw, and residential development. Area 5 includes commercial developments such as Mississippi Tent and Party Rental, Callaway's Yard and Garden Center, Capitol Body Shop, and Mack Haik auto dealership. Testimony and exhibits also show that Canton provides various services to Areas 1-4, such as domestic and fire-protection water, sewer collection and treatment, electricity, and natural gas.

¶71. The chancery court found that all of the dense development in Areas 1 and 2 exist in large part due to the availability of Canton services. The court found that Areas 1 and 2 are within an active path of growth but that Areas 3, 4, and 5 lie, at best, in potential paths of growth for Canton. Ultimately, the chancery court concluded that this indicium weighs in favor of annexation for Areas 1 and 2, neutrally for annexation of Areas 3 and 4, and against annexation for Area 5.

¶72. We find the chancery court's findings for the path-of-growth indicium are supported by substantial, credible evidence.

**Potential Health Hazards**

¶73. The chancery court took into consideration the following subfactors for determining whether potential health hazards exist in proposed annexation areas: "(1) potential health hazards from sewage and waste disposal; (2) a large number of septic tanks in the area; (3) soil conditions which are not conducive to on-site septic systems; (4) open dumping of garbage; and (5) standing water and sewage." *In re City of Winona*, 879 So. 2d at 979 (quoting *Gousset v. City of Macon (In re City of Macon)*, 854 So. 2d 1029, 1038 (Miss. 2003)).

¶74. Evidence was presented that there are several locations throughout the proposed areas where failed septic-tank systems were allegedly allowing untreated waste water, as well as sewage, to escape to the ground and/or run off into ditches. Canton's expert testified that these conditions are potential health hazards that create human exposure to dangerous bacteria. Canton's expert also identified other conditions in the proposed areas that serve as

25

potential mosquito breeding grounds. Canton submitted to the court that if allowed to annex, it had plans to address these issues through code enforcement and its city-wide mosquito spraying.

¶75. Evidence also was presented that soil types in all of Madison County are not conducive to on-site wastewater-treatment systems such as septic tanks. Testimony was presented that the mere existence of on-site treatment systems are, by definition, potential health hazards because of improper maintenance and the soil conditions in the area. There are areas in the proposed annexation areas that are not connected to a centralized sewer system, which creates potential health hazards. Canton submitted that it intended to address these on-site wastewater-treatment health hazards by extending sanitary sewers in areas where that service is not already available.

¶76. The chancery court noted, however, that according to Canton's Code of Ordinances, Canton does not require a connection to the city's sewage system unless the property owner is on a street where a line is located, or which is within one-hundred feet from a street having such a line. Also, connection is not required if property owners now have septic tanks that are in good repair and function adequately. The court noted that there are twelve businesses and eighty-three homes in the current city limits without centralized sewer. And in Areas 3 and 4, there are low-density developments that do not have an apparent immediate need for centralized sewer.

¶77. Evidence was presented concerning the open dumping of garbage identified during field surveys conducted by Canton's experts. Multiple photographs depicted open dumping

of debris in Area 3. Photos also showed open dumping, debris piles, and junk cars throughout Areas 2 through 4. Canton submitted that it intended to fix these health hazards with code enforcement.

¶78. Evidence also was presented showing multiple instances of standing water due to poor drainage in Areas 3 and 4. Canton submitted that it intended to commit substantial funds in its annexation plan to address these drainage problems, including improved ditch maintenance.

¶79. The chancery court concluded that the potential health hazards from sewage and waste disposal exist in the proposed annexation areas, as Canton demonstrated, and are worthy of remedy, annexation or otherwise. The court found, however, that Canton presented limited credible evidence indicating that annexation of the areas would provide such a remedy. The court noted that significant credible evidence also was presented that Canton has a poor track record as to the same issues within the current city limits. *See In re City of Columbus*, 644 So. 2d at 1175-76 (acknowledging that the existence of health hazards in a proposed annexation area is irrelevant unless the city is planning to remedy the hazards).

¶80. We find no manifest error in the chancery court's findings and conclusion on this indicium.

**Financial Ability**

¶81. This Court has provided several subfactors to evaluate reasonableness as related to a city's financial ability to make the improvements and furnish municipal services promised. They may include the following:

(1) present financial condition of the municipality; (2) sales tax revenue history; (3) recent equipment purchases; (4) the financial plan and department reports proposed for implementing and fiscally carrying out the annexation; (5) fund balances; (6) the City's bonding capacity; and (7) expected amount of revenue to be received from taxes in the annexed area.

*In re City of Macon*, 854 So. 2d at 1039 (citing *Burch v. Town of Mantachie (In re Town of Mantachie)*, 685 So. 2d 724, 728 (Miss. 1996); *Blackwell v. City of Meridian (In re City of Meridian)*, 662 So. 2d 597, 611 (Miss. 1995); citing *City of Jackson v. City of Ridgeland (In re City of Ridgeland)*, 651 So. 2d 548, 558 (Miss. 1995); *In re City of Columbus*, 644 So. 2d at 1171; *City of Greenville v. Farmers, Inc.*, 513 So. 2d 932, 935 (Miss. 1987); *City of Jackson v. City of Ridgeland (In re City of Ridgeland)*, 388 So. 2d 152, 156 (Miss. 1980); *Wise v. City of Biloxi (In re City of Biloxi)*, 361 So. 2d 1372, 1374 (Miss. 1974); *Bridges v. City of Biloxi*, 253 Miss. 812, 178 So. 2d 683, 685 (1965); *Butler v. City of Gulfport (In re City of Gulfport)*, 253 Miss. 738, 179 So. 2d 3, 6 (1965)).

¶82. Despite hearing testimony from Canton's experts that Canton's financial condition was in good condition, the chancery court received other evidence that demonstrated a number of significant concerns with Canton's present financial condition. According to the chancery court, Canton has lost an annual funding source from Canton Municipal Utilities (CMU) beginning in 2017. These CMU transfers ranged from approximately $912,000 to $1.8 million annually for Canton. According to Phyllis Rhodes, Canton's chief financial officer, Canton's cash on hand was largely attributable to the CMU transfers. Canton thus reduced its 2018 budget by $1.8 million to offset the loss of the CMU transfers and saw a budget surplus of $318,307 for 2018. But the chancery court found that this surplus resulted

from Canton's inability to fill numerous budgeted positions across multiple departments, including police, fire, and public-works departments.

¶83. The total budget for supervision and finance was reduced by almost 14 percent; the police-department budget was reduced by more than 20 percent; the fire-department budget was reduced by more than 7 percent; the public-works department budget was reduced by more than 32 percent; and the parks-and-recreation department budget was reduced by almost 30 percent. According to the chancery court, this equates to a roughly 1/6 budget cut from the prior year and a significant reduction in the level of services offered to Canton residents.

¶84. The chancery court found that after making these hard decisions to cut expenditures in 2018, Canton's FY 2019 budget eliminated many of the 2018 reductions resulting in a projected $472,101 deficit for FY 2019. This indicated to the court that the 2018 cuts were not sustainable, and Canton is likely to continue to run deficits going forward if it does not raise taxes or reduce services.

¶85. The court noted that while it was presented with projected revenues and expenditures in the proposed annexation areas, noticeably absent was any financial projection for the existing city. The court took note of the financial projections of the Annexation Objectors' financial expert, Eddie Favre, that predicts Canton will reach a negative fund balance (-$310,889) by the end of FY 2021. The court noted that, by law, Canton is not permitted to allow its fund balance into the negative. Miss. Code Ann. § 21-35-25 (Rev. 2015) ("When a deficit is indicated the budget shall be revised.").

¶86. The court noted that Favre's projection was based on budgeted numbers of a single year (2019), not actual numbers. Canton responded that if Favre used the actual numbers for 2018, the projection becomes more favorable to Canton. But the court found that the 2018 results appeared to be anomaly, and the only numbers that are even slightly usable are the 2019 budgeted numbers.

¶87. The court stated that, in addition, Canton's violations of Mississippi audit and budget laws, including Mississippi Code Section 21-35-31 (Rev. 2015) (requiring an annual audit to be conducted within twelve months of the end of the fiscal year), Mississippi Code Section 21-35-9 (Rev. 2015) (requiring municipal budgets to set out the cash balance in the fund at the close of the present preceding financial year and to set out the working cash balance for the next fiscal year); and Mississippi Code Section 21-35-25 (Rev. 2015) (requiring publication of budget revisions resulting in more than a 10 percent change in a department's adopted budget) caused serious concerns for the court about Canton's current financial condition.

¶88. On the other hand, the chancery court found that Canton has a history of stable sales tax revenues that weigh in favor of annexation. The chancery court noted that evidence was presented that Canton has $6,025,821 in remaining general obligation bonded debt capacity "under the 15% Rule" and that Canton's remaining bond capacity is healthy and sufficient. The court noted that while general-obligation bonds cannot be used to pay operational expenses, Canton's bonding capacity supports Canton's ability to make the improvements and furnish the municipal services promised.

¶89. The chancery court noted testimony from Canton's expert, who performed an analysis of the *ad valorem* tax revenues expected from annexation and provided the court a five-year financial projection setting forth anticipated revenues and expenditures related to annexation. The expert testified the even without accounting for sales-tax revenues, the annexation will generate net general-fund revenues that will be added to Canton's debt-service-fund balance.

¶90. The court found that the annexation, based upon the projections, would theoretically provide the funds necessary to accomplish the improvements outlined in Canton's Services and Facilities Plan. Ultimately, the chancery court concluded that annexation of Areas 1 and 2 would be "financially feasible, realistic, and reasonable" for Canton.

¶91. We find no manifest error in the chancery court's findings with this indicium factor. The chancery court's findings are supported by substantial evidence.

**Fairness/Equity Evaluation**

¶92. As mentioned, "municipalities must demonstrate through plans and otherwise, that residents of annexed areas will receive something of value in return for their tax dollars in order to carry the burden of showing reasonableness." *In re City of Columbus*, 644 So. 2d at 1172. The chancery court "is required to balance the equities by comparing the City's need to expand and any benefits accruing to residents from the annexation with any adverse impact, economic or otherwise, which will probably be experienced by those who live in and own property in the annexation area." *In re City of Jackson*, 551 So. 2d at 867-68. That residents and landowners in the proposed annexation area "will have to start paying city property taxes is not sufficient to show unreasonableness." *Id.*

31

¶93. As the chancery court found, Canton currently has the highest millage rate in Madison County at 56.32 mills. Evidence was presented that the financial impact resulting from Canton taxes would be offset by savings on both homeowners-insurance premiums and on certain county-tax levies that could potentially be eliminated. Upon annexation, residents and property owners in areas currently rated a Class 10 will immediately get the benefit of the Canton's Class 6 fire rating for homeowners-insurance purposes. Testimony was presented that reduction of the fire-protection classification from its present rating of a Class 10 to Class 6 will result in significant savings on homeowners-insurance premiums. The chancery court found, by way of example, the evidence reflects that a home valued at $150,000 in the areas currently rated as a Class 10 would receive a discount on homeowners-premiums of $1,650 if the home is masonry construction and $2,865 if the home is frame construction. But residents and property owners in Areas currently rated a Class 6 will see a tax increase. Canton, however, contended that the increase will be offset by the provision of valuable municipal-level services.

¶94. CMU provides residential water service and sewer to all of Areas 1 and 2, and portions of Areas 3 and 4. These residents pay a higher rate than residents inside Canton utilities. Upon annexation, these residents will immediately begin receiving their water and sewer services at in-city rates, which will result in savings on their utility bills. The chancery court noted that annexation would result in a *de minimis* tax increase to owners of vacant/agricultural land.

¶95. We find no manifest error with the chancery court's findings on this indicium.

32

**CONCLUSION**

¶96. We find no merit to the claim that the chancery court was without jurisdiction to hear and decide the incorporation petition, and we affirm the chancery court's grant of incorporation as set forth in the decree. We find that the chancery court's grant of annexation for Areas 1 and 2 and denial of annexation for Areas 3, 4, and 5 is without manifest error and is supported by substantial, credible evidence. Accordingly, we affirm the chancery court's decree with regard to annexation.

¶97. **ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: AFFIRMED.**

**KITCHENS AND KING, P.JJ., COLEMAN, CHAMBERLIN AND ISHEE, JJ., CONCUR. GRIFFIS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, C.J., AND MAXWELL, J.**

**GRIFFIS, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶98. I agree with the chancellor's grant of Gluckstadt's incorporation, and I also agree with the chancellor's denial of Canton's annexation for Areas 3, 4, and 5. But I disagree with the chancellor's grant of Canton's annexation of Areas 1 and 2 and find that the substantial, credible evidence does not support annexation of these areas. Consequently, I concur in part and dissent in part.

¶99. In reviewing an annexation case, the main question is "whether the annexation is reasonable, under the totality of the circumstances." *Coahoma Cnty. v. City of Clarksdale (In re City of Clarksdale)*, 267 So. 3d 236, 241 (Miss. 2019) (internal quotation mark omitted) (quoting *City of Horn Lake v. City of Southaven (In re City of Southaven)*, 5 So.

33

3d 375, 376 (Miss. 2009)).  To help determine whether an annexation is reasonable, twelve "indicia of reasonableness" are considered:

> (1) the municipality's need to expand, (2) whether the area sought to be annexed is reasonably within a path of growth of the city, (3) potential health hazards from sewage and waste disposal in the annexed areas, (4) the municipality's financial ability to make the improvements and furnish municipal services promised, (5) need for zoning and overall planning in the area, (6) need for municipal services in the area sought to be annexed, (7) whether there are natural barriers between the city and the proposed annexation area, (8) past performance and time element involved in the city's provision of services to its present residents, (9) economic or other impact of the annexation upon those who live in or own property in the proposed annexation area, (10) impact of the annexation upon the voting strength of protected minority groups, (11) whether the property owners and other inhabitants of the areas sought to be annexed have in the past, and in the foreseeable future unless annexed will, because of their reasonable proximity to the corporate limits of the municipality, enjoy economic and social benefits of the municipality without paying their fair share of taxes, and (12) any other factors that may suggest reasonableness.

*In re City of Clarksdale*, 267 So. 3d at 242 (citing *Town of Marion v. City of Meridian (In re City of Meridian)*, 992 So. 2d 1113, 1116 (Miss. 2008)).

¶100.  The majority finds "no manifest error in the [chancellor]'s approval of proposed Areas 1 and 2 for annexation."  Maj. Op. ¶ 56.  It further finds the chancellor's "application of the indicia factors for [Areas 1 and 2] is supported by substantial and credible evidence."  Maj. Op. ¶ 56.  I respectfully disagree and find the chancellor's decision regarding the annexation of Areas 1 and 2 was manifestly wrong and was not supported by substantial, credible evidence. Like the majority, I limit my discussion to the challenged indicia of reasonableness.

I.     *Canton's Need to Expand*

34

¶101. In reviewing the need for expansion, the chancellor may consider the following factors:

> (1) spillover development into the proposed annexation area; (2) the City's internal growth; (3) the City's population growth; (4) the City's need for development land; (5) the need for planning in the annexation area; (6) increased traffic counts; (7) the need to maintain and expand the City's tax base; (8) limitations due to geography and surrounding cities; (9) remaining vacant land within the municipality; (10) environmental influences; (11) the City's need to exercise control over the proposed annexation area; and (12) increased new building permit activity.

*City of Jackson v. Byram Incorporators*, 16 So. 3d 662, 683-84 (Miss. 2009) (quoting *Neal v. City of Winona (In re City of Winona)*, 879 So. 2d 966, 974 (Miss. 2004)). A review of the applicable factors shows that Canton does not have a reasonable need to expand.[3]

*Factor (4) - Canton's Need for Development Land*

*Factor (9) - Remaining Vacant Land within Canton*

¶102. Canton admits that it does not need to annex additional property to support its development needs. Michael Slaughter, Canton's urban planning expert, testified that the annexation was "not solely based on, hey, we are just totally out of land; the City of Canton is not." At Canton's current rate of development, its 5,622 acres of vacant unconstrained land, almost half of the total land within the current city limits, will likely last generations before Canton needs to replenish its vacant land supply. On cross-examination, Slaughter agreed that in its nearly two-hundred-year history, Canton has not come close to building out its available vacant land. Thus, by its own admission, Canton has ample vacant, unconstrained land to meet its development needs.

---

[3] I address the applicable factors out of order.

¶103.  In *City of Jackson*, the vacant land resources of the city comprised approximately 25,700 vacant acres or 37 percent of the total land area within the existing city.  ***Bunch v. City of Jackson (In re City of Jackson)***, 691 So. 2d 978, 983 (Miss. 1997).  This Court agreed with the objectors' expert that "[b]efore the City of Jackson annexes more land and residents for which it has had to extend infrastructure and provide services, it should make an effort to extend that infrastructure to the vacant, developable land within the existing boundaries and take steps to encourage development in those areas."  ***Id.***

¶104.  Here, Canton has a higher percentage of available land than the City of Jackson did. Vacant, developable land constitutes approximately 40.4 percent of total land in the city. Indeed, Canton has only built out roughly 22 percent of its 5,622 acres of total available land. As the Court instructed in *City of Jackson*, Canton should first utilize vacant land resources to encourage growth and meet citizens' needs before expanding to increase tax rolls. Canton's vast land resources simply do not support a need to expand.

### Factor (3) - Canton's Population Growth

¶105.  The record shows that Canton's population is declining.  The objectors' expert, Chris Watson, testified that per American Community Survey (ACS) population estimates, Canton's 2017 population had dropped by 464 people from its 2010 level.  Canton's 464-person decrease represents an approximate 3.5 percent decrease between 2010 and 2017. Even Canton's expert admitted that Canton was experiencing a "net out-migration" of its population.  Clearly, Canton's population growth, or lack thereof, does not support a need to expand.

*Factor (2) - Canton's Internal Growth*

*Factor (12) - Canton's Increased New-Building-Permit Activity*

¶106. Canton failed to establish any appreciable level of building activity and internal growth to support a need to expand. Per Canton's Building Permit Activity table, from 2012 to 2018, Canton issued only fifteen permits for new commercial construction and only seventeen permits for single-family homes. Canton's expert admitted that from 2014 to the time of trial, the amount of total developed land in the city actually decreased. He further admitted that single-family residential development was very limited within the city. Moreover, in further evidence of Canton's lack of growth and building activity, Canton's expert testified that based on his discussions with the city's building director, there have been "maybe 6 or 8 [demolitions] a year."

¶107. Notably, Canton did not perform a land-absorption analysis. According to Chris Watson, the objectors' expert, a land-absorption analysis would have indicated when the city "may reach a degree of build-out such as it would need to replenish its supply of vacant land." Watson opined that based on "[t]he low permitting and the type of development that is occurring in Canton, coupled with the degree of vacant land that it has, . . . Canton has a supply of vacant land that will last it for a very, very long time."

¶108. Canton's stagnant building growth, coupled with its declining population and low building-permit activity, weigh heavily against the need to expand.

*Factor (1) - Spillover Development*

37

¶109. Canton relies heavily on spillover development in Areas 1 and 2 in support of its need to expand. The majority agrees and notes that testimony regarding "spillover" in Areas 1 and 2 "established a clear need for Canton to expand[.]" Maj. Op. ¶ 64. But as the objectors assert, Canton's reliance on spillover development in Areas 1 and 2 cannot overcome the shortcomings of the evidence in support of expansion.

¶110. In support of its spillover argument, Canton relies on *Holmes v. Town of Leaksville (In re Town of Leaksville)*, 283 So. 3d 701 (Miss. 2019), and *City of Saltillo v. City of Tupelo (In re City of Tupelo)*, 94 So. 3d 256 (Miss. 2012). But as the objectors assert, these cases are distinguishable because, unlike Canton, they both involve an express need for additional developable land. In *Town of Leaksville*, this Court noted that "the town of Leakesville consists of only 1.6 square miles of land and has a lack of developable land within the town limits." *In re Town of Leaksville*, 283 So. 3d at 708. Likewise, in *City of Tupelo*, the Court stated that the need for additional land supported Tupelo's need for expansion: "As a result of the vacant land, which is constrained by flood plains and floodways and its proximity to commercial and residential development, Tupelo is in need of additional developable land." *In re City of Tupelo*, 94 So. 3d at 272.

¶111. Additionally, unlike in the *City of Madison*, *City of Ridgeland*, and *City of Horn Lake* cases, in which the annexations were affirmed despite high levels of usable vacant land, Canton has failed to show high growth activity. *City of Jackson v. City of Madison (In re City of Madison)*, 650 So. 2d 490 (Miss. 1995); *City of Jackson v. City of Ridgeland (In re City of Ridgeland)*, 651 So. 2d 548 (Miss. 1995); *City of Southaven v. City of Horn Lake*

38

*(In re City of Horn Lake)*, 630 So. 2d 10 (Miss. 1993). For example, in *City of Madison*, the city's expert performed a land-rate utilization study and determined that Madison would be completely built out in 13.4 years and 75 percent built out in eight to nine years. *In re City of Madison*, 650 So. 2d at 496. He opined that despite having more than 50 percent of vacant, developable land, Madison had a need to expand in order to manage rapid growth. *Id.* Likewise, in *City of Ridgeland*, expert testimony showed that "growth in Ridgeland was 'unprecedented'" and that Ridgeland was "growing 'much faster' than the typical city." *In re City of Ridgeland*, 651 So. 2d at 555. And in *City of Horn Lake*, the city's "rapid" and "extraordinary" residential growth supported its need to expand despite its having large amounts of vacant, developable land. *In re City of Horn Lake*, 630 So. 2d at 17.

¶112. Here, as previously discussed, Canton has ample vacant, unconstrained land to meet its development needs, and it is not experiencing growth, let alone rapid growth. Indeed, the objectors' expert opined that Canton "has a supply of vacant land that will last it for a very, very long time."

¶113. The record lacks substantial, credible evidence of Canton's internal growth, its population growth, its need for additional development land, its lack of remaining vacant land, and an increase in building-permit activity. The fact that limited spillover development has occurred does not change the analysis or the weight of the evidence against the need to expand.

II.    *Path of Growth*

39

¶114. The chancellor found and the majority agrees that because "Areas 1 and 2 are within an active path of growth," this factor weighed in favor of annexation. Maj. Op. ¶ 71. But as previously discussed, the record shows that growth is not occurring in Canton. As a result, Canton relies on the area around the I-55 corridor where growth is coming from Madison and Gluckstadt.

¶115. In support of its corridor theory of annexation, Canton cites testimony from Mayor William Truly regarding various developments including Key Constructors, a retirement home, a Burger King, the John Deere relocation, and the Trails at Madison Apartments. But as the objectors demonstrated at trial, Canton possesses significant amounts of vacant land even in the areas where it states that growth is occurring. Moreover, various maps show that the 2007-2008 annexation areas at I-55 around Sowell Road remain predominantly undeveloped, the majority of the 2006 annexation areas around Nissan Parkway west of I-55 and around Highway 51 in the Nichols Road area remain vacant, and the I-55 area annexed in 2007, referred to as the "Neu Market" annexation, has remained largely vacant since it was brought within the city. Thus, despite the chancellor's findings, Areas 1 and 2 are not within an active path of growth.

### III. Financial Ability

¶116. This Court has developed several factors to evaluate reasonableness as related to financial ability which may or may not include: (1) present financial condition of the municipality; (2) sales tax revenue history; (3) recent equipment purchases; (4) the financial plan and department reports proposed for implementing and fiscally carrying out the annexation; (5) fund balances; (6) the City's bonding capacity; and (7) expected amount of revenue to be received from taxes in the annexed area.

***Gousset v. City of Macon (In re City of Macon)***, 854 So. 2d 1029, 1039 (Miss. 2003) (citing

***Burch v. Town of Mantachie (In re Town of Mantachie)***, 685 So. 2d 724, 728 (Miss.

1996)). The chancellor found that Canton's annexation of Areas 1 and 2 would be

"financially feasible, realistic, and reasonable." In so finding, the chancellor relied on

Canton's expert who, as the majority notes, "performed an analysis of the *ad valorem* tax

revenues from annexation and provided the court a five-year financial projection setting forth

anticipated revenues and expenditures related to annexation." Maj. Op. ¶ 89. Based on these

*anticipated* revenues and expenditures, the chancellor found that the annexation would

provide the funds necessary to accomplish the improvements outlined in Canton's Services

and Facilities Plan. But as the substantial, credible evidence shows, Canton's declining

finances cast doubt on its ability to provide the services promised to the citizens in the

annexed areas. Indeed, the expected amount of revenue to be received from taxes in the

annexation does not outweigh Canton's present financial condition or its sales-tax-revenue

history. ***Id.*** at 1039.

¶117. Beginning in 2017, Canton lost an annual funding source from Canton Municipal

Utilities (CMU) in excess of $1.2 million per year. Historically, CMU had provided Canton

an annual transfer of $1.2 million, but CMU's chief executive officer testified that the

transfer had been eliminated due to an opinion from the Mississippi attorney general stating

that it should not occur. As a result, the million-dollar transfer ceased and will not continue

in the future. As CMU's CEO testified, it is a "permanent" loss of revenue for Canton.

¶118. The cessation of the annual CMU transfer represented a loss of approximately 17.4 percent of Canton's budgeted general-fund revenues for the 2017 fiscal year. In order to offset the loss of the CMU transfer, Canton reduced its 2018 fiscal year budget by $1.8 million. Thus, the loss of the CMU transfer has forced Canton to cut its budgets and look for new revenue sources.

¶119. Moreover, the record shows a deficit trend regarding Canton's finances. Through the 2019 fiscal year, five of the last seven fiscal years, and three of the four fiscal years preceding trial were, or were projected to be, deficits. For example, the audit report for fiscal year 2016 reflects a deficit of $457,703; the unaudited trial balance for fiscal year 2017 reflects a deficit of $534,736; and the approved amended budget for the general fund for fiscal year 2019 reflects a deficit of $472,101.

¶120. As the objectors' financial expert testified, the deficit trend strongly indicates the need for financial projections for the current, existing city. But on six separate occasions, Canton's urban-planning expert created estimates for projected revenues and expenditures *in the proposed annexation area* but did not include Canton's *existing city-financial* projections. By omitting its existing city-financial projections, Canton overlooks its serious financial problems and its negative deficit trends.

¶121. The objectors' financial expert prepared existing city-financial projections. According to his projections, Canton will reach a negative fund balance (-$310,889.37) by the end of fiscal year 2021. By the end of fiscal year 2023, Canton's fund balance is projected to fall to negative $1,740,811.43, and the resultant city's fund balance, including all five annexation

42

areas, is projected to fall to negative $974,402.43. Thus, Canton has a negative future financial outlook, and these expert projections highlight the severity of the city's current financial problems.

¶122.  Notably, although Canton reduced its 2018 fiscal year budget by $1.8 million to offset the loss of the CMU transfer, its 2019 fiscal year budget reinstated more than one-third (approximately $600,000) of the reductions from 2018.  These reinstated cuts indicate that the $1.8 million reduction was not sustainable.  Additionally, an amendment to the original 2019 fiscal year budget was approved with a net spending increase of approximately $112,000 for Canton to again operate the Multi-Purpose Arena,[4] putting the budget into a projected deficit.  Thus, unless new revenues are generated and expenses are reduced, Canton's deficit trend will continue.

¶123.  The record further shows Canton's lack of capable management.  Indeed, Canton was unable to advise the chancellor how much cash it had on hand.  Under Mississippi Code Section 21-35-9 (Rev. 2015), a municipal-adopted budget "shall set out . . . the cash balance in the fund at the close of the present preceding fiscal year [and] the working cash balance necessary for the next fiscal year . . . ."  When asked about the city's cash balance, Canton's chief financial officer testified, "[w]e have more cash than what is showing on [the adopted 2019 fiscal-year budget]."  But when the chancellor asked how much money was in the bank,

_____

[4] Canton leased the Multi-Purpose Arena to a tenant but then reestablished its operation, resulting in a significant expenditure for which Canton had not previously budgeted.

43

the CFO testified, "I guess I would have to check with the City Clerk because I don't know[.]"

¶124. Canton did not produce any bank statements to support its alleged current cash position until redirect of its financial expert, Demery Grubbs, when it introduced a set of one-page printouts of unreconciled bank statements for September 30, 2018. But as Grubbs testified, these documents do not indicate Canton's actual current working cash position, as the documents do not factor in checks written but not yet deposited by the payee. Indeed, when asked by the chancellor whether the financial documents produced by Canton told him whether Canton had "enough money to pay the bills the rest of the month," Grubbs responded, "[n]o, sir." Thus, as a result of Canton's failure to properly state its working cash balances, the chancellor was in the dark as to how much operating money Canton actually had going into its proposed annexation of more than one thousand additional acres of land. Consequently, the chancellor's finding that Canton's annexation of Areas 1 and 2 would be "financially feasible, realistic, and reasonable" is not supported by substantial, credible evidence.

### IV. Canton's Past Performance

¶125. As the objectors assert, Canton's poor history of past performance indicates that it cannot meet its citizens' needs. Indeed, Canton's understaffed police and fire departments as well as its flooding issues and unfunded capital needs cast doubt on whether it will be able to adequately provide services to the thousands of additional citizens it would take in by annexation.

44

¶126. Canton's police department is admittedly understaffed. Police Chief Otha Brown testified that he needed 2.5 sworn officers per one thousand citizens. Canton's expert testified that, based on Canton's 2018 population figure for the existing city (13,609 citizens), Canton would need 34.02 officers to meet the 2.5 officers per one thousand citizens standard that Chief Brown discussed. With twenty-seven officers, Canton is currently seven officers short of what the police chief says he needs. Based on the City's 2018 population figure for the proposed annexation areas (4,467 additional citizens), Canton's expert explained that the City would need eleven additional officers to meet the 2.5 officers per one thousand citizens standard needed by the police chief. Thus, if Canton takes in the annexation areas, the lack of manpower to provide adequate police protection becomes even more pronounced, and the level of officers per population would only become more diluted.

¶127. To support Canton's lack of police protection, the objectors presented evidence that on multiple occasions, Canton has requested assistance from the Madison County Sheriff's Department due to an increase in crime. Madison County Sheriff Randy Tucker testified that based on Canton's requests, it appears that Canton is "short staffed and having a crime problem."

¶128. Additionally, like the police department, Canton's fire department also suffers from manpower concerns. In 2012, Canton received notice that it would drop from a Class 5 to a Class 6 fire-insurance-classification rating if it did not address several shortcomings, including manpower. Canton was unable to meet the requirements, and its rating dropped. Further, according to Canton Fire Chief Andrew Hughes, the fire department has on

numerous occasions been unable to provide enough firefighters on a truck to enter a burning building. Fire-call records were produced showing numerous instances when only two men per truck reported to fire calls. Chief Hughes testified that he can "get by" with only two men on a truck, but that to enter a burning structure, the fire department has to dispatch another truck to the scene, depleting the resources available for fire protection in other parts of Canton.

¶129. Further, testimony was presented regarding a flooding problem near Canton's downtown square. Although the City's public-works director testified that no engineering studies had been performed on the flooding issue during his tenure since 2017, an engineering study would be the next step if blowing the line did not work. Such testimony exemplifies yet another unknown cost that Canton would need to pay to remedy the problem.

¶130. Moreover, Canton has unfunded capital needs including street paving, street reconstruction, and drainage problems if annexation is approved. Much testimony was presented regarding city road paving, drainage improvements, and extensive proposed street repairs for which no cost estimates have been performed. And bonding capacity cannot save the city, as testimony showed that general obligation bonds cannot be used to pay operational expenditures.

¶131. Canton provided no analysis that any surpluses it may receive from annexation would be sufficient to correct the understaffing in the police or fire department or to provide the needed capital improvements. Accordingly, the substantial, credible evidence does not support annexation.

*V.      Economic Impact*

¶132.  "[M]unicipalities must demonstrate through plans and otherwise, that residents of annexed areas will receive something of value in return for their tax dollars in order to carry the burden of showing reasonableness."  ***In re City of Macon***, 854 So. 2d at 1043 (internal quotation mark omitted) (quoting ***Robinson v. City of Columbus (In re City of Columbus)***, 644 So. 2d 1168, 1172 (Miss. 1994)).  Canton has the highest millage rate in Madison County at 56.32 mills. The majority finds that "[e]vidence was presented that the financial impact resulting from Canton taxes would be offset by savings on both homeowners-insurance premiums and on certain county-tax levies that could potentially be eliminated."  Maj. Op. ¶ 93.  The majority notes that, for example,

> Upon annexation, residents and property owners in areas currently rated a Class 10 will immediately get the benefit of the Canton's Class 6 fire rating for homeowners-insurance purposes. Testimony was presented that reduction of the fire protection classification from its present rating of a Class 10 to Class 6 will result in significant savings on homeowners-insurance premiums.

Maj. Op. ¶ 93.  It further notes that

> CMU at present provides residential water service and sewer to all of Areas 1 and 2, and portions of Areas 3 and 4. These residents pay a higher rate than residents inside Canton utilities. Upon annexation, these residents will immediately begin receiving their water and sewer services at in-city rates, which will result in savings on their utility bills.

Maj. Op. ¶ 94.

¶133.  But absent is any analysis of this cost savings versus the tax-millage increase.  In other words, while there may be initial savings on utility bills or homeowners-insurance premiums, there is no showing that the residents will receive something of value because of the addition

47

of other taxes imposed by the city in an effort to expand its tax base. Stated differently, Canton offers no assurance that those initial savings will remain after the additional tax is implemented. In fact, calculations produced by the objectors show that the total value of the savings is only about 1 percent of the home value. Thus, it appears that Canton's proposed annexation of Areas 1 and 2 is simply an attempt to expand its tax base in a manner that benefits the city more than the residents.

¶134. Canton's ample vacant, developable land, its lack of growth, its declining population, its declining finances, and its poor past performance and unfunded capital needs provide an additional burden on taxpayers without a like benefit in return. Considering the indicia of reasonableness, I find Canton failed to meet its burden of proof. The substantial, credible evidence presented and set forth in the record does not support annexation of Areas 1 and 2. Accordingly, I would reverse the chancellor's annexation of Areas 1 and 2 and render judgment in favor of the objectors.

**RANDOLPH, C.J., AND MAXWELL, J., JOIN THIS OPINION.**